RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 10a0143p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,

               _Plaintiff-Appellant,_

       _v._

RICHARD MUNOZ,

               _Defendant-Appellee._

No. 09-5357

Appeal from the United States District Court
for the Eastern District of Tennessee at Winchester.
No. 06-00023-002—Harry S. Mattice, Jr., District Judge.

Argued: March 2, 2010

Decided and Filed: May 18, 2010

Before: BOGGS and NORRIS, Circuit Judges; ADAMS, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Perry H. Piper, ASSISTANT UNITED STATES ATTORNEY, Chattanooga, Tennessee, for Appellant. Martha M. Hall, LAW OFFICES OF MARTHA M. HALL, San Diego, California, for Appellee. **ON BRIEF:** Scott A. Winne, ASSISTANT UNITED STATES ATTORNEY, Chattanooga, Tennessee, for Appellant. Martha M. Hall, LAW OFFICES OF MARTHA M. HALL, San Diego, California, for Appellee.

_____

## OPINION

_____

    BOGGS, Circuit Judge. This case reaches us in an unusual posture: the _government_ appeals the district court's _grant_ of a new trial under Federal Rule of

---

[*] The Honorable John R. Adams, United States District Judge for the Northern District of Ohio, sitting by designation.

Criminal Procedure 33. In the underlying trial, defendant Richard Munoz was found guilty of conspiracy to distribute methamphetamine and aiding and abetting distribution of methamphetamine. Approximately two months after the verdict, but before sentencing, Munoz obtained new counsel. Thereafter, Munoz belatedly moved for a new trial, arguing that trial counsel had provided constitutionally ineffective assistance. After an evidentiary hearing, the district court granted the motion, specifically grounding its new-trial grant on the violation of Munoz's Sixth Amendment right to effective assistance of counsel.

We hold that the district court did not abuse its discretion in determining that Munoz's untimely filing of his Rule 33 motion was the result of excusable neglect. However, because we find that trial counsel's assistance more than met the minimum standard required by the Sixth Amendment, we reverse the district court's grant of a new trial. We leave for another day the question, addressed neither by the district court nor the parties on appeal, whether a district court may grant a new trial based on lackluster representation that does not fall below the constitutionally required standard.

## I. BACKGROUND

### A. Pre-Trial Events

In July 2006, Carol Ann O'Neal was arrested for selling methamphetamine to an undercover officer in Warren County, Tennessee. O'Neal cooperated with the authorities and led them to her supplier, Aaron George, a resident of Arizona. By this time, the Tennessee Bureau of Investigation ("TBI") had taken control of the developing case. George, in turn, agreed to cooperate and identified *his* source, Jose Luis Tagaban, who lived in Imperial, California.

With TBI agents listening in, George called Tagaban and arranged for a methamphetamine shipment to McMinnville, Tennessee. Tagaban told George to wire $2,000 to Richard Munoz in El Centro, California. On July 17, 2006, TBI agents did so. The next day, Munoz picked up the money order. On July 20, 2006, a federal Drug Enforcement Administration agent photographed Munoz leaving a FedEx office in

Imperial, California. The following day, a FedEx package containing approximately 586 grams of methamphetamine arrived at the McMinnville address George had provided Tagaban.

On July 25, 2006, federal drug charges were filed in the Eastern District of Tennessee against O'Neal, George, Tagaban, Munoz, and two others. Two days later, Tagaban and Munoz were arrested in Imperial, California. Both men waived their *Miranda* rights and were immediately interviewed by TBI agents Mark Delaney and Heath Frizzell. Paul Bergmann was assigned to Munoz as trial counsel. At some point thereafter, all defendants except Munoz agreed to plead guilty and cooperate with the government. The last of Munoz's co-defendants to plead guilty, George, did so on October 26, 2006 – twelve days before trial.

## B. Munoz's Trial

### 1. *Delaney and Frizzell*

At trial, TBI agents Delaney and Frizzell testified that during their post-arrest interview with Munoz on July 27, 2006, he had admitted knowingly shipping drugs via FedEx at Tagaban's request. According to Frizzell, at that interview, Munoz had "stated that he knew there was drugs inside of the packages [he had shipped for Tagaban,] but he knew that it wasn't marijuana." Similarly, Delaney testified that Munoz had admitted "that he knew both boxes contained drugs but he did not know . . . what type of drugs," although "he knew it was not marijuana."

### 2. *Tagaban*

Tagaban testified that he had caused methamphetamine to be shipped to George in McMinnville, Tennessee on numerous occasions. Tagaban always shipped the drugs via FedEx, generally using a carrier named Jeffery Jimenez to take the packages to the FedEx depot. On two occasions, however, Jimenez was unavailable, and Tagaban instead used Munoz, who was both his personal friend and his co-worker at the Imperial Irrigation District, where the two men made their rounds together in the same truck.

On the first such occasion, in March or April 2006, while Tagaban and Munoz were on the job, Tagaban handed Munoz a sealed package already prepared for shipment, telling Munoz that it contained "a couple of t-shirts and a coffee mug." However, on the second occasion – the July 2006 transaction which gave rise to the charges at issue – Tagaban prepared the shipment while Munoz watched. In Munoz's presence, Tagaban placed a clear plastic bag containing white powder in the box; when Munoz asked what the powder was, Tagaban told him it was "meth." Tagaban asked Munoz to take the box to FedEx, and Munoz agreed to do so. Tagaban never paid Munoz for his assistance.

Tagaban also testified that he would occasionally hold parties at his house attended by his drug-dealer friends, as well as by Munoz. According to Tagaban, at one of these parties, about two months prior to his and Munoz's arrest, Tagaban "did a [drug] transaction right there in front of [Munoz]," selling two ounces of methamphetamine to a man named Jeffrey Dalente while Munoz looked on. Accordingly, Tagaban was "pretty sure [Munoz] had to know" Tagaban "[was] a drug dealer."

**3.** *George*

George testified that he had received drugs on many occasions from Tagaban, and that he would often pay Tagaban in person while Tagaban was on the job at the Imperial Irrigation District. George would hand Tagaban between $8,000 and $20,000 in cash, "plain as day," while Tagaban was in his Irrigation District truck. On some of those occasions, Tagaban would provide George with drugs. According to George, Munoz was "almost always" present in the passenger seat of the truck during these transactions.

George also testified that he attended some of Tagaban's parties, that he saw Munoz there, and that drugs were in use at the parties, but did not testify one way or the other as to whether Munoz saw the drugs or as to any drug transactions at the parties.

**4.  *Munoz***

Munoz contradicted much of the above testimony.  He acknowledged that he was Tagaban's friend and coworker at the Imperial Irrigation District, and he admitted having retrieved the money order wired by the TBI agents at Tagaban's request. However, Munoz claimed that Tagaban had told him that the money order was from "a friend in Tennessee that owed [Tagaban] some money" and that Tagaban would be using the money to pay a bail bondsman who had posted Tagaban's bail for an unrelated arrest. Munoz also testified that while he had twice taken packages to FedEx for Tagaban, he did not know on *either* occasion that the package contained drugs; both times, the package had already been sealed when Tagaban handed it to him.

With respect to the second package, Munoz testified on direct examination:

Q. All right. Did [Tagaban] reassure you that it was okay, that he was just mailing things to friends?

A. Yes. I think . . . Mr. Tagaban . . . told me, "Don't worry about it, bro. I'm not going to put you–" He said, "Everything's fine."

The government cross-examined Munoz on this particular point as follows:

Q. And [Tagaban] . . . said to you, on the second package, "Don't worry. Everything's fine. Don't worry about it." You agree with . . . that, too?

A. Yes. He– Yes.

* * *

Q. So on that second package, he had some reason to tell you, "Don't worry about it. Everything's fine[?]"

A. I guess. I guess he did.

Q. Did you suspect that everything was not okay?

A. No. I had no reason to distrust him, no.

Q. Did you express some hesitation about sending a Fed Ex package that would cause him to say that to you?

A. No. What it was, it was that it was – I said it like a joke. I turned around, and I just said, "What, am I going to be a personal mailman?" since he had – this was the second time he had asked me.

Q. Okay. So it was a joke for you?

A. No, I was just joking around with him at the time. And he said – that's when he said that, "Come on, bro." He goes, "Just send this package for me." He goes – he goes, "I won't put you–" He said, "Everything–" He said, "I won't put you in a bind," or "I wouldn't put you –" basically, yeah, "I wouldn't put you in a bind."

With respect to his post-arrest interview with Delaney and Frizzell, Munoz testified:

A. At the end of the interview, Officer Frizzell . . . asked me, . . . "You knew that there was drugs in the box." He goes, "What was in the box?" And I said, "I don't know." And he goes, "Well–" he basically said, kind of like, "Take a guess." And I said, "I don't know." And he goes– I said, "I know it wasn't marijuana." And he stated, "Because of the smell?" And I said, "Well, I think if it was marijuana, it wouldn't– I think it was something bigger, because I'm here." And I believe there was something bigger in the box. And he asked, "Well, what do you think?" And I said, "I don't know. I think it was cocaine." That's what I said.

\* \* \*

Q. Did you really know what was in the box, either box?

A. No. No, I didn't.

Munoz testified that he had visited Tagaban's house several times to watch pay-per-view boxing, but that he had not attended any "parties." The extent of the activities at those gatherings was Munoz, Tagaban, Tagaban's family and "maybe one or two people from work" sitting in front of the television watching the fights. Munoz denied having seen any drugs on those occasions.

**5.** *Fregoso*

Robert Fregoso, a California law-enforcement officer who had been Munoz's neighbor for over 20 years, testified as a character witness for Munoz. According to Fregoso, Munoz's reputation for truthfulness in the community was "[v]ery good."

## 6. *Verdict*

On November 8, 2006, the jury found Munoz guilty of conspiracy to distribute 500 grams or more of methamphetamine, in violation of 21 U.S.C. § 846, and aiding and abetting the distribution of 500 grams or more of methamphetamine, in violation of 21 U.S.C. § 841(a)(1).

## C.  Post-Trial Developments

On November 14, 2006, Bergmann filed a motion for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29, which the district court denied on January 31, 2007, finding that there had been "extensive contradictory testimony" on both sides of the issue of Munoz's knowledge.

Meanwhile, on January 4, 2007, Bergmann moved to withdraw as counsel, and on February 13, Munoz's current counsel, Martha Hall, filed a notice of appearance. On February 22, 2007, the district court granted Bergmann's motion to withdraw and authorized Hall to appear in Bergmann's stead.  Five days later, on February 27, Hall filed a motion to continue sentencing, in which she requested leave to file an untimely Rule 33 motion for a new trial.

The next day, the district court granted Hall's request to continue sentencing, but denied Hall's request for leave to file an untimely Rule 33 motion, as Hall had "not presented any information from which the Court could conclude that the failure to timely file the motion for new trial was the result of excusable neglect . . . ."  The district court's denial, however, was without prejudice to Hall's submission of such a motion for the court's consideration and "address[ing] the issue of excusable neglect therein . . . ."

On May 8, 2007 – six months after the verdict, and about ten weeks after Hall's appearance – Hall filed an untimely Rule 33 motion which addressed the issue of excusable neglect.  As for the motion's merits, Hall argued that Bergmann had provided

constitutionally ineffective assistance of counsel.[1]  On June 21, 2007, the district court held an evidentiary hearing.  There, Munoz's sister testified that, among other things, she had contacted Bergmann and volunteered to testify as a character witness at Munoz's trial or to put Bergmann in touch with other potential character witnesses, but Bergmann had summarily rejected her offer.  Bergmann was present at the evidentiary hearing, and Hall initially indicated that she intended to put him on the stand.  However, after the government pointed out that calling Bergmann to testify might waive the attorney-client privilege between Munoz and Bergmann, Hall elected not to do so.  After an off-the-record discussion, both parties stipulated that Bergmann did not hire a professional investigator as part of his trial preparation.

On March 2, 2009, the district court granted Munoz's Rule 33 motion, set aside the jury's verdict, and ordered a new trial, holding that Bergmann had provided constitutionally ineffective assistance of counsel.  *See United States v. Munoz*, No. 4:06-cr-23-2, 2009 WL 529859 (E.D. Tenn. Mar. 2, 2009).  The government timely appealed.

## II. STANDARD OF REVIEW

We review a district court's decision to grant or deny a Rule 33 motion for abuse of discretion.  *United States v. Carson*, 560 F.3d 566, 585 (6th Cir. 2009).  We also review a district court's determination that a late filing was the result of "excusable neglect" for abuse of discretion.  *Nafziger v. McDermott Int'l, Inc.*, 467 F.3d 514, 522 (6th Cir. 2006).  Abuse of discretion occurs when a district court "relies on clearly erroneous findings of fact, improperly applies the law, or uses an erroneous legal standard."  *United States v. Washington*, 584 F.3d 693, 695 (6th Cir. 2009).

---

[1]Hall's motion also asserted that newly discovered evidence warranted a new trial.  However, the district court did not address that claim, noting that "[a]s the parties' respective arguments . . . evolved and [became] refined in the course of the briefing, Mr. Munoz ha[d] conceded that his stronger argument [was] . . . ineffective assistance of counsel."  *See United States v. Munoz*, No. 4:06-cr-23-2, 2009 WL 529859, at *3 (E.D. Tenn. Mar. 2, 2009).  The parties do not raise the newly-discovered-evidence issue on appeal; accordingly, we do not consider it.

An ineffective-assistance-of-counsel claim "is a mixed question of law and fact, for which district-court determinations are subject to de novo review." *Railey v. Webb*, 540 F.3d 393, 415 (6th Cir. 2008) (internal quotation marks omitted); *see also Strickland v. Washington*, 466 U.S. 668, 697 (1984).  It is of no consequence that the ineffective-assistance claim in this case is presented in the atypical context of an overarching new-trial-motion determination, which, as we have stated, is reviewed for abuse of discretion. This is because mixed questions of law and fact involve the *application of law* to fact, *Ornelas v. United States*, 517 U.S. 690, 696 (1996), and an "improper[] appli[cation of] the law" constitutes an abuse of discretion, *Washington*, 584 F.3d at 695.  Accordingly, we give no deference to the district court's application of the *Strickland* ineffective-assistance standard to the facts of this case.[2]

### III. DISCUSSION

**A.  The District Court's Decision To Allow Munoz's Untimely Rule 33 Motion**

**1.  *Legal Standard***

At all relevant times, Rule 33 specified that "any motion for a new trial grounded on newly discovered evidence must be filed within 3 years after the verdict or finding of guilty," and that "[a]ny motion for a new trial grounded on any reason other than newly discovered evidence must be filed within 7 days after the verdict or finding of guilty." Fed. R. Crim. P. 33(b).[3]  Munoz does not assert that his ineffective-assistance claim is based on "newly discovered evidence," and, in any event, that argument is foreclosed in this circuit.  *See United States v. Seago*, 930 F.2d 482, 488-89 (6th Cir. 1991) (stating that in general, "an ineffective assistance of counsel claim cannot be considered newly discovered evidence for the purpose of a motion for new trial").

---

[2] Indeed, in one unpublished case in which an ineffective-assistance claim was raised via Rule 33 motion, we stated that such claims are reviewed de novo, although we declined to review that claim for lack of a developed factual record.  *United States v. Allen*, 254 F. App'x 475, 477 (6th Cir. 2007).  Other circuits have similarly stated, in the context of Rule 33 appeals, that ineffective-assistance claims, as mixed questions of law and fact, are reviewed de novo.  *See, e.g.*, *United States v. Fuchs*, 467 F.3d 889, 910 (5th Cir. 2006); *United States v. Carbonaro*, 186 F. App'x 41, 42 (2d Cir. 2006).

[3] The seven-day period for motions for "any reason other than newly discovered evidence" was extended to 14 days in 2009.  This is of no moment for purposes of the present appeal.

Accordingly, his motion, which was filed six months after verdict, was prima facie untimely.

However, Rule 33 must be read in conjunction with Federal Rule of Criminal Procedure 45, which provides that "[w]hen an act must or may be done within a specified period, the court . . . may extend the time . . . on a party's motion made . . . after the time expires if the party failed to act because of excusable neglect." Fed. R. Crim. P. 45(b). *See* Advisory Comm. Notes to 2005 Amendments of Rule 33 ("[U]nder Rule 45(b)(1)(B), if for some reason the defendant fails to file the underlying motion for new trial within the specified time, the court may nonetheless consider that untimely underlying motion if the court determines that the failure to file it on time was the result of excusable neglect."); *United States v. Robinson*, 430 F.3d 537, 541 (2d Cir. 2005) ("The time limitations specified in Rule 33 are read in conjunction with Rule 45, which establishes how to compute and extend time.").[4]

We have never discussed what constitutes "excusable neglect" in the context of a late-filed Rule 33 motion. However, the term "excusable neglect" has been interpreted in other procedural contexts. In *Pioneer Investment Services Co. v. Brunswick Associates*, 507 U.S. 380 (1993), the Supreme Court construed the phrase "excusable neglect" as it is used in Rule 9006(b)(1) of the Federal Rules of Bankruptcy Procedure:

> The ordinary meaning of "neglect" is "to give little attention or respect" to a matter, or, closer to the point for our purposes, "to leave undone or unattended to *esp[ecially] through carelessness.*" The word therefore encompasses both simple, faultless omissions to act and, more commonly, omissions caused by carelessness. . . . Hence, by empowering the courts to accept late filings "where the failure to act was the result of excusable neglect," Congress plainly contemplated that the courts would be permitted, where appropriate, to accept late filings caused by

---

[4]We note that in one published decision with facts similar to those in the present case, this court did *not* read Rule 33 in conjunction with Rule 45. *See United States v. Kuehne*, 547 F.3d 667, 692-93 (6th Cir. 2008) (stating that defendant's ineffective-assistance excuse "ma[de] intuitive sense," but refusing to consider that excuse on the ground that "Rule 33 itself speaks of no such exception"). However, at the time the motion at issue in *Kuehne* was made, Rule 45 explicitly stated that a court could *not* use that rule to extend the time to take action under Rule 33. This provision was removed effective December 1, 2005. *See* Advisory Comm. Notes to 2005 Amendments of Rule 45. Accordingly, *Kuehne* does not control this case.

> inadvertence, mistake, or carelessness, as well as by intervening circumstances beyond the party's control.
>
> * * *
>
> Because Congress has provided no other guideposts for determining what sorts of neglect will be considered "excusable," we conclude that the determination is at bottom an equitable one, taking account of all relevant circumstances surrounding the party's omission.

*Id.* at 388, 395 (internal citations omitted) (alteration in original). The Court then listed a number of non-exclusive factors to be balanced in making this equitable determination: "(1) the danger of prejudice to the nonmoving party, (2) the length of the delay and its potential impact on judicial proceedings, (3) the reason for the delay, (4) whether the delay was within the reasonable control of the moving party, and (5) whether the late-filing party acted in good faith." *Nafziger*, 467 F.3d at 522 (citing *Pioneer*, 507 U.S. at 395).[5]

Importantly, the *Pioneer* Court specifically rejected the appellate court's statement that, in the excusable-neglect inquiry, "it would be inappropriate to penalize respondents for the omissions of their attorney." 507 U.S. at 396. To the contrary, the Court stressed that, in general, "clients must be held accountable for the acts and omissions of their attorneys," *ibid.*, who are, after all, those clients' "freely selected agent[s]," *id.* at 397 (quoting *Link v. Wabash R. Co.*, 370 U.S. 626, 633-34 (1962)). "Any other notion," the Court believed, "would be wholly inconsistent with our system of representative litigation, in which each party is deemed bound by the acts of his lawyer-agent . . . ." *Ibid.* (quoting *Link*, 370 U.S. at 634). Consequently, the Court held that "in determining whether respondents' failure to [timely] file . . . was excusable, the

---

[5]While the *Nafziger* panel parsed the language of *Pioneer* as specifying five separate factors, other circuits have found only four, construing "the reason for the delay" and "whether the delay was within the reasonable control of the moving party" as a single factor. *See, e.g.*, *Silivanch v. Celebrity Cruises, Inc.*, 333 F.3d 355, 366 (2d Cir. 2003); *In re Orthopedic Bone Screw Prods. Liab. Litig.*, 246 F.3d 315, 322-23 (3d Cir. 2001). We have also done so in an unpublished opinion. *See United States v. Williams*, No. 97-2328, 1998 WL 863748, at *2 (6th Cir. Nov. 23, 1993). It appears to this panel that the four-factor division is more faithful to the *Pioneer* Court's language. *See Pioneer*, 507 U.S. at 395 (listing among relevant factors "the reason for the delay, *including* whether it was within the reasonable control of the movant" (emphasis added)). We therefore treat these two considerations together in our analysis.

proper focus is upon whether the neglect of respondents *and their counsel* was excusable." *Pioneer*, 507 U.S. at 396-97.

Subsequently, in *Stutson v. United States*, 516 U.S. 193 (1996), the Court suggested that the *Pioneer* excusable-neglect standard also applies in criminal cases – specifically, with respect to Federal Rule of Appellate Procedure 4(b), which governs when a late notice of appeal may be filed. *Id.* at 195-97; *see also United States v. Thompson*, 82 F.3d 700, 701-02 (6th Cir. 1996) (following *Stutson*). We therefore see no reason to believe that the *Pioneer* analysis would not also be applicable in the Rule 33 context, and, indeed, both parties submit that it is. We therefore turn to the district court's balancing of the *Pioneer* factors.

**2. *Analysis of* Pioneer *Factors***

**a. Reason for Delay and Whether Delay Was Within Munoz's Control**

In this case, the time limit set forth in Rule 33 is unambiguous, and Bergmann's failure to timely file a motion was, in theory, entirely within his control. Given the *Pioneer* Court's admonition that clients must generally be saddled with the errors of counsel, it might appear at first glance that the reason-for-delay factor favors the government.

However, in the first place, it is significant that *Pioneer* was a bankruptcy case; as the district court noted, *Pioneer*'s "your lawyer, your fault" principle should be applied less stringently in the criminal context, where "our legal traditions reflect a certain solicitude for [a defendant's] rights, to which the important public interests in judicial efficiency and finality must occasionally be accommodated." *Stutson*, 516 U.S. at 196; *see also United States v. Moses*, No. CR 05 061 E BLW, 2006 WL 581191, at *4 (D. Idaho Mar. 8, 2006) ("In the civil context, a client is bound by the acts and omissions of his or her attorney . . . . However, in determining what constitutes excusable neglect, the courts have generally been more solicitous of a criminal defendant's rights." (internal quotation marks and citations omitted)).

Secondly, we note that in the habeas context, courts have long made special procedural allowances for defendants who fail to timely raise ineffective-assistance-of-counsel claims against lawyers who continue to represent them at the time those claims would properly have been raised. As the Supreme Court has noted, it is axiomatic that "an attorney . . . is unlikely to raise an ineffective-assistance claim against himself." *Massaro v. United States*, 538 U.S. 500, 503 (2003); *see also Fautenberry v. Mitchell*, 515 F.3d 614, 640 (6th Cir. 2008) ("[W]e conclude that it would be unreasonable to expect counsel to raise an ineffective assistance claim against himself."). Aside from the potential conflict of interest inherent in such a claim – which we will address shortly – "[e]ven the scrupulous attorney searching the record in good faith would likely be blind to his [own] derelictions at . . . trial . . . ." *Billy-Eko v. United States*, 8 F.3d 111, 114 (2d Cir. 1993), *abrogated on other grounds by Massaro*, 538 U.S. at 504.

Additionally, as the district court noted, in cases involving late-filed notices of appeal, several courts have either held or suggested that ineffective assistance of counsel may justify a finding of excusable neglect. For example, in *United States v. Clark*, the Fifth Circuit found excusable neglect under Federal Rule of Appellate Procedure 4(b) where the defendant's attorney had failed to file a notice of appeal despite the defendant's explicit request that he do so. 193 F.3d 845, 846-47 (5th Cir. 1999) ("[W]e are faced with a clear case of ineffective assistance of counsel, which is sufficient to prove excusable neglect."); *see also United States v. McKenzie*, 99 F.3d 813, 816 (7th Cir. 1996) (holding that "it was not an abuse of discretion for the district court to find [defendant's] neglect excusable and to grant an extension of time to file his notice of appeal" where defendant's attorney "le[ft] town and bec[ame] totally inaccessible" during relevant time period).

Such a holding initially appears to clash with the *Pioneer* Court's admonition that clients must generally bear the consequences of their attorneys' inexcusable errors. However, in addition to the civil/criminal distinction already discussed, the Eleventh Circuit has provided a satisfying rationale, grounded in the *Pioneer* Court's attorney-as-

agent paradigm, for distinguishing cases of ordinary attorney error, where clients will be bound by counsel's action, from cases of egregious acts and omissions:

> Respondents urge this Court to . . . hold[] that a client is always bound by the mistakes of his attorney, regardless how extreme or far afield from the client's directives those actions may be. . . . [This] "your lawyer, your fault" approach is consistent with the general principle [expounded in *Pioneer*] that lawyers are agents, and "clients must be held accountable for the acts and omissions of their attorneys."
>
> * * *
>
> [However,] under fundamental tenets of agency law, a principal is not charged with an agent's actions or knowledge when the agent is acting adversely to the principal's interests. . . . [Thus,] when an attorney's actions extend beyond everyday mistakes into the realm of serious misconduct, . . . in some circumstances such malfeasance may be far enough outside the range of behavior that reasonably could be expected by a client . . . [that it would be inappropriate to] impute [such] attorney misconduct to [the] client . . . .

*Downs v. McNeil*, 520 F.3d 1311, 1319-21 (11th Cir. 2008) (internal quotation marks and citations omitted).

We note that the present case is not on all fours with prior cases where courts have found excusable neglect based upon ineffective assistance of counsel. In those cases, as the government notes, "the [late-filing] party *intended* to comply with the applicable limitations period and, but for counsel's neglectful actions, would have done so." For example, in *Clark*, the defendant asked his counsel to timely file a notice of appeal, but counsel did not. 193 F.3d at 846-47. Here, by contrast, Munoz presumably had no *intent* to file a Rule 33 motion for ineffective assistance during the week when he could have timely done so; that intent only arose later, once he had acquired new counsel. Rule 45(b), however, does not require that the defendant have contemporaneously *intended* to comply with the relevant deadline. It merely requires that "the party [have] failed to act because of excusable neglect" – or, in the words of the *Pioneer* Court, that the party, for an excusable reason, "le[ft the act] undone or unattended to . . . ." 507 U.S. at 388.

Another distinction between the present case and the notice-of-appeal cases is that in those cases, the courts found that trial counsel's failure to timely file a notice of appeal was *itself* constitutionally ineffective assistance of counsel. Here, by contrast, the allegedly ineffective assistance occurred during the underlying trial; Munoz does not specifically argue that Bergmann's failure to timely file a Rule 33 motion was, *in itself*, ineffective assistance. However, that concern should not control the outcome of this case. As the Eleventh Circuit explained in *Downs*, clients may be excused under the *Pioneer* standard for their agents' egregious acts or omissions not because those acts or omissions violate the Sixth Amendment right to counsel, but because of the agency-law axiom that a principal is not bound by his agent's conduct where the agent "is acting adversely to the principal's interests." *Downs*, 520 F.3d at 1320-21.

A situation like the one alleged in the present case – where an attorney refuses to fall on his own sword for his client, even though that is his client's last best hope – is a paradigmatic case of adverse interests:

> [T]here [is] a clear conflict between [a client's] interest in presenting and prevailing in his ineffective assistance claim and [his attorney's] interest in protecting himself from the damage such an outcome would do to his professional reputation and from exposure to potential malpractice liability or bar discipline. That an attorney would have great incentives to prevent a client from prevailing in an ineffective assistance claim [against him] is both self-evident and well documented in the case law. . . .

*Manning v. Foster*, 224 F.3d 1129, 1134-35 (9th Cir. 2000) (internal citations omitted) (holding, in habeas context, that client "may assert as cause for his procedural default the actions of his attorney which, even though not constitutionally defective, were not attributable to him" because they were "tainted by a conflict of interest").

Accordingly, we find that Bergmann's continuing representation of Munoz during the window for timely filing a Rule 33 motion was a valid reason for the delay, and that the delay was not fairly within Munoz's control. This factor therefore favors Munoz.

**b. Prejudice to the Government**

The government argues that it would be prejudiced in four ways by having to retry Munoz after an additional six months' delay.[6]  However, two of those – the fact that the government would have to "prepare and present [its] case over again," and the fact that Munoz "has now had the benefit of . . . hearing the government's case" – would be equally true had the motion been filed timely.  Because these consequences cannot be attributed to Munoz's filing delay, they have no place in the *Pioneer* analysis.  The government's third prejudice claim – that the passage of time compromises witnesses' memories – is true as a general matter, but, at least on the facts of this case, six months is not a sufficient period of time to create significant prejudice on that score.

The government's most substantial prejudice argument arises from the fact that, by the time Munoz filed his new-trial motion in May 2007, the testifying co-defendants, Tagaban and George, had already been sentenced (Tagaban in January 2007 and George in March 2007).  In particular, both men had already received reduced sentences in exchange for their cooperation at Munoz's trial.  Thus, the government argues, it now lacks leverage with which to assure their cooperation at Munoz's retrial – as opposed to the situation that would have existed if Munoz had timely filed his new-trial motion in November 2006.

However, Tagaban and George's plea agreements require them to testify truthfully "whenever" called by the government.  If they do not testify truthfully at retrial, they would be in breach of those plea agreements, and, in theory, "the government [would have] the option to . . . seek specific performance of the agreement[s] . . . ." *United States v. Cimino*, 381 F.3d 124, 128 (2d Cir. 2004); *see also* LaFave, Criminal Procedure § 21.2(e) (3d ed. 2007).  Perhaps more practically, the government may still exert substantial leverage over Tagaban and George by virtue of

---

[6]The district court reasoned that no prejudice existed because "[t]he Government appears to have been in the same position to respond to [Munoz's new-trial] motion when it was filed in May 2007 as it would have been if [the motion had been timely] filed . . . ." *Munoz*, 2009 WL 529859, at *4.  However, we agree with the government that the proper inquiry is the potential prejudice stemming from having to *retry the case* after a delay, rather than merely from having to respond to a belated motion.

Federal Rule of Criminal Procedure 35(b), which allows a further sentence reduction for post-sentencing substantial assistance. Consequently, the prejudice factor does not clearly favor the government.

### c. Length of Delay and Its Impact on Judicial Proceedings

The government argues that even if ineffective assistance of counsel is, in theory, a proper excuse, Munoz failed to act with diligence once Hall took over his representation. Hall filed her notice of appearance on February 13, 2007, and the district court authorized her to appear on February 22, 2007. Munoz did not request leave to file an untimely new-trial motion until five days thereafter, and did not actually *file* the motion for another ten weeks.

We have certainly found delays of this magnitude inexcusable in the past. *See, e.g.*, *Nafziger*, 467 F.3d at 523 (37-day delay not excusable neglect under circumstances). However, we agree with the district court that Munoz's delay was not clearly inordinate *here*, given the sensitive posture in which Hall took over the case and the unique difficulties she presumably faced as a result. *See* Anne M. Voigts, *Narrowing the Eye of the Needle: Procedural Default, Habeas Reform, and Claims of Ineffective Assistance of Counsel*, 99 Colum. L. Rev. 1103, 1131 (1999) (noting that, where successor counsel will be arguing former counsel's ineffective assistance, former counsel's "incentives not to help the client . . . [may] affect cooperation with successor counsel"); *cf. Massaro*, 538 U.S. at 506 (noting that appellate counsel may be in an "awkward position vis-à-vis trial counsel," as "trial counsel will be unwilling to help appellate counsel familiarize himself with a record for the purpose of understanding how it reflects trial counsel's own incompetence"). We believe that a district judge is in the best position to know how long a diligent successor counsel would require to research and prepare a new-trial motion under the circumstances presented by any given case. Thus, the delay factor does not clearly favor the government.[7]

---

[7]Further, we note that Munoz promptly moved to continue sentencing once Hall appeared, such that, despite the delay, Munoz had not yet been sentenced and no appeal had been taken at the time Munoz filed his new-trial motion. There was therefore no waste of judicial resources as a result of Munoz's delay.

### d. Good Faith

The government does not contest the district court's finding that Munoz's delay involved no bad faith.

### 3. *Balancing of* Pioneer *Factors*

The *Pioneer* factors "do not carry equal weight; the excuse given for the late filing must have the greatest import. While [the others] might have more relevance in a closer case, the reason-for-delay factor will always be critical to the inquiry." *Lowry v. McDonnell Douglas Corp.*, 211 F.3d 457, 463 (8th Cir. 2000); *accord United States v. Torres*, 372 F.3d 1159, 1163 (10th Cir. 2004); *Silivanch v. Celebrity Cruises, Inc.*, 333 F.3d 355, 366 n.7 (2d Cir. 2003); *Hosp. del Maestro v. NLRB*, 263 F.3d 173, 175 (1st Cir. 2001). As we have concluded, this foremost *Pioneer* consideration favors Munoz. The remaining *Pioneer* factors are not clearly in favor of the government. Accordingly, we hold the district court did not abuse its discretion in concluding that Munoz's delay was the result of excusable neglect.[8]

### B. Merits of Munoz's Rule 33 Motion

### 1. *Legal Standards*

### a. Rule 33 Standard

Rule 33 provides that "[u]pon the defendant's motion, [a district] court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). The rule "does not define 'interest[] of justice' and the courts have had little success in trying to generalize its meaning." *United States v. Kuzniar*, 881 F.2d 466, 470 (7th Cir. 1989). Nonetheless, from the body of Rule 33 case law, several recurring themes emerge.

---

[8]The government worries that our holding will invite a deluge of opportunistic Rule 33 motions by convicted defendants, who, merely by crying ineffective assistance of counsel, will now be able to delay sentencing while they leisurely assemble the case for a new-trial motion. However, common sense suggests that district courts are capable of distinguishing clearly frivolous ineffective-assistance allegations from those with potential merit, and that – especially given the already overcrowded state of most district-court dockets – late-filed motions will not routinely be indulged.

The paradigmatic use of a Rule 33 motion is to seek a new trial on the ground that "the [jury's] verdict was against the manifest weight of the evidence." *United States v. Crumb*, 187 F. App'x 532, 536 (6th Cir. 2006); *see also United States v. Legette-Bey*, 147 F. App'x 474, 486 (6th Cir. 2005); *United States v. Graham*, 125 F. App'x 624, 628 (6th Cir. 2005); *United States v. Solorio*, 337 F.3d 580, 589 n.6 (6th Cir. 2003). Munoz, however, did not move for a new trial on manifest-weight-of-the-evidence grounds.[9]

Furthermore, it is widely agreed that Rule 33's "interest of justice" standard allows the grant of a new trial where substantial legal error has occurred. *See United States v. Wall*, 389 F.3d 457, 474 (5th Cir. 2004) (stating that "any error of sufficient magnitude to require reversal on appeal is an adequate ground for granting a new trial" (quoting Wright, Federal Practice & Procedure § 556 (3d ed. 2004))); *Kuzniar*, 881 F.2d at 470 (stating that Rule 33 relief is available where "the substantial rights of the defendant have been jeopardized by errors or omissions during trial"); *United States v. De Miranda*, No. 2008-20, 2008 WL 5412848, at *3 (D.V.I. Dec. 29, 2008) (stating that Rule 33 relief is available where defendant "show[s] . . . reversible error at his trial"). A violation of Munoz's Sixth Amendment right to effective assistance of counsel clearly meets this standard. *See United States v. Bass*, 460 F.3d 830, 838 (6th Cir. 2006) (acknowledging that defendant may "s[eek] a new trial on the ground that his counsel allegedly rendered ineffective assistance"); *accord United States v. Russell*, 221 F.3d 615, 619 (4th Cir. 2000); *United States v. Mojica*, 984 F.2d 1426, 1452 (7th Cir. 1993); *United States v. Sands*, 968 F.2d 1058, 1066 (10th Cir. 1992); *United States v. Brown*, 476 F.2d 933, 935 (D.C. Cir. 1973).[10]

---

[9]In deciding Rule 33 motions based on the manifest weight of the evidence, we have said that a district judge "may 'sit as a thirteenth juror' and consider the evidence to ensure that there is no miscarriage of justice." *Legette-Bey*, 147 F. App'x at 486 (quoting *United States v. Ashworth*, 836 F.2d 260, 266 (6th Cir. 1988)); *see also Graham*, 125 F. App'x at 628 ("A district judge, in considering the weight of the evidence for purposes of adjudicating a motion for new trial, may act as a thirteenth juror, assessing credibility of witnesses and weight of the evidence."). Because Munoz did not base his new-trial motion on the manifest weight of the evidence, but rather, on the finding of a Sixth Amendment violation, the district court's reliance upon this "thirteenth juror" language was improper. *See Munoz*, 2009 WL 529859, at *2.

[10]The government argues that the "preferred route" for entertaining ineffective-assistance claims is not via Rule 33 motion, but in a petition for habeas corpus. While we have certainly stated that, *as a general matter*, ineffective-assistance claims are best raised on habeas, this is only because in the mine run of cases, "the record of trial counsel's allegedly deficient performance is not fully developed" before that

Less clear is whether a district court may grant Rule 33 relief where the verdict is not against the substantial weight of the evidence, and where no reversible error or violation of the defendant's substantial rights has occurred, but where the district court nonetheless believes that "the interest of justice" requires a new trial. That question has particular significance in this case, as one such scenario might be where a defendant (such as Munoz) establishes that trial counsel's performance was in some way substandard, although not egregious enough to constitute a Sixth Amendment right-to-counsel violation – i.e., where a defendant shows "ineffective assistance light."

The generic "interest of justice" language in Rule 33's text, at least at first glance, would appear to permit the grant of a new trial on the basis of perceived unfairness of less than reversible magnitude. *Cf.* 28 U.S.C. § 2255 (stating that habeas relief may be granted where a sentence was "imposed in violation of the Constitution or laws of the United States . . . ."); *see also* Wright, Federal Practice & Procedure § 552 (3d ed. 2004) ("The grounds for relief are broader under [Rule 33] than under Section 2255. [Rule 33] allows a new trial whenever the interest of justice requires it, while the statutory remedy is limited to grounds that may be raised on collateral attack, and thus for the most part reaches only constitutional defects in the proceedings.").

In one decision, the Eleventh Circuit held that the "interest of justice" is a "broad standard" that may be invoked even where the alleged defect "was not reversible error." *United States v. Vicaria*, 12 F.3d 195, 198-99 (11th Cir. 1994) (affirming grant of new trial where district court "concluded [in the interest of fairness] that it should have given [a jury] instruction it had declined [to give]," even though such an instruction was not required by law). Similarly, the Fifth Circuit has stated that, under certain conditions, "[a] district court may grant a new trial in the interest of justice even if it does not find that a specific legal error occurred at trial." *United States v. Scroggins*, 379 F.3d 233, 256-57 (5th Cir. 2004), *judgment vacated on other grounds*, 543 U.S. 1112 (2005)

point. *United States v. Vallellanes*, 339 F. App'x 579, 584 (6th Cir. 2009). By contrast, we have not hesitated to consider ineffective-assistance claims outside the habeas context (most often, on direct appeal) "[i]f the parties have adequately developed the record . . . ." *United States v. Webber*, 259 F. App'x 796, 806 (6th Cir. 2008). In cases like this one, where the district court has conducted an evidentiary hearing on the ineffective-assistance claim, deferring that claim until collateral review would serve no purpose.

(holding that, even "[a]bsent legal error," district court may still grant a new trial based on two witnesses' failure to show up and testify, if it resulted in "a manifest injustice" and defendant "would have probably been acquitted" otherwise).

*Vicaria* and *Scroggins* appear to support the viability of an "ineffective assistance light" claim in the Rule 33 context. There is even a line of cases (albeit somewhat dated) from the District of Columbia Circuit specifically stating that "a more powerful showing of inadequacy [of counsel] is necessary to sustain a collateral attack than to warrant an order for new trial . . . ." *Bruce v. United States*, 379 F.2d 113, 117 (D.C. Cir. 1967); *see also United States v. Thompson*, 475 F.2d 931, 932 n.3 (D.C. Cir. 1973).

However, other circuits have refused to recognize "ineffective assistance light" as a viable ground for Rule 33 relief. The Seventh Circuit, for one, stated:

> [The District of Columbia] Circuit[] . . . [believes] that a "more powerful" showing of counsel's inadequacy is necessary to sustain a collateral attack on a conviction than would be necessary to obtain a favorable ruling on a motion for a new trial. We do not share that view. The constitutional standards governing adjudication of ineffective-assistance-of-counsel claims do not vary, in this Circuit at least, with the nature of the proceedings in which such claims are raised.

*United States v. Ellison*, 557 F.2d 128, 133-34 (7th Cir. 1977).

More recently, the Fifth Circuit noted that "[a]s an abstract matter, it might well be argued that the *Strickland* standard be applied only in collateral attacks, and that a somewhat more lenient standard ought to be utilized when the district court considers a motion for new trial." *United States v. Logan*, 861 F.2d 859, 864 (5th Cir. 1988). However, the *Logan* panel rejected this proposition, based on the *Strickland* Court's dictum that "[t]he principles governing ineffectiveness claims [enunciated in *Strickland*] should apply in federal collateral proceedings as they do on direct appeal *or in motions for a new trial*." *Logan*, 861 F.2d at 864 (quoting *Strickland*, 466 U.S. at 697) (emphasis in *Logan*). Consequently, the *Logan* panel held that "in order to properly grant a new trial on [the] ground [of ineffective assistance], the district court must be able to determine that the *Strickland* [standard] is met." *Ibid.*

We have never considered the viability of an "ineffective assistance light" claim, or even the broader question of whether Rule 33 relief may be granted based on amorphous claims of trial unfairness that do not constitute reversible error. However, we have repeatedly cited and applied *Strickland* in holding that a district court did not abuse its discretion in *refusing* to grant a new-trial motion on ineffective-assistance grounds. *See, e.g.*, *United States v. Holycross*, 333 F. App'x 81, 84 (6th Cir. 2009); *United States v. Allen*, 254 F. App'x 475, 476-78 (6th Cir. 2007); *Bass*, 460 F.3d at 838; *United States v. Garcia*, 19 F.3d 1123, 1126 (6th Cir. 1994).[11]

Finally, we note that the overarching Rule 33 standard is what the "interest of justice . . . requires," and that the *Strickland* test was specifically minted to determine whether "counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." 466 U.S. at 686. It could therefore be inferred that where a defendant cannot satisfy the *Strickland* standard, his trial *can* "be relied on as having produced a just result," and the "interest of justice" thus does not require a new trial.

Having said all of this, we nonetheless leave the resolution of the question to another day. First of all, the district court expressly based its new-trial grant on the finding that a full-fledged Sixth Amendment right-to-counsel violation had occurred. In fact, the district court was itself of the belief that "[t]he standard for judging an assertion of ineffective assistance of counsel in the context of Rule 33 is identical to the standard employed in the context of a habeas corpus petition – the standard set forth in *Strickland v. Washington*." *Munoz*, 2009 WL 529859, at *5 (citation omitted).[12]

---

[11]Of course, those cases' *holdings* are not directly on point, as "no Sixth Amendment violation, ergo *within* the district court's discretion to *refuse* Rule 33 relief" does not imply "no Sixth Amendment violation, ergo *outside* the district court's discretion to *grant* Rule 33 relief." However, the language we used in those cases is broad enough to encompass both of those propositions. *See, e.g.*, *Holycross*, 333 F. App'x at 84 ("The district court may grant a motion for a new trial 'if the interest of justice so requires.' To succeed on a claim of ineffective assistance [in this context], a defendant *must* establish . . . that his attorney 'made errors so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment' – and that the errors were prejudicial." (quoting *Strickland*, 466 U.S. at 687) (internal citation omitted) (emphasis added)).

[12]In support of this proposition, the district court cited only two Michigan district-court cases, and did not address the *Strickland* Court's specific language or any of the out-of-circuit authorities discussed herein.

Further, while we often affirm incorrectly reasoned district-court judgments on alternative bases, *see Angel v. Kentucky*, 314 F.3d 262, 264 (6th Cir. 2002), "[t]his is our prerogative," and we need not do so, *Sellers v. Regents of the Univ. of California*, 432 F.2d 493, 496 (9th Cir. 1970). Here, because the parties have never addressed "ineffective assistance light" in their briefs or arguments, and the law is less than clear-cut, we believe it prudent to abstain from exercising this prerogative. *See Graoch Assocs. #33, L.P. v. Louisville/Jefferson County Human Relations Comm'n*, 508 F.3d 366, 371 (6th Cir. 2007) (suggesting that it would be inappropriate to affirm on an alternative basis where parties would be "denied an opportunity to respond to the new theory"). Accordingly, we now turn to the district court's *Strickland* analysis.

**b.  *Strickland* Ineffective Assistance Standard**

Once again, under *Strickland*, counsel's performance violates the Sixth Amendment only where "counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." 466 U.S. at 686. To meet this test, a defendant must show (1) "that counsel's representation fell below an objective standard of reasonableness" and (2) that "counsel's performance [was] prejudicial to the defense . . . ." *Id.* at 688, 692.

Counsel's performance is objectively unreasonable only where "the identified acts or omissions were outside the wide range of professionally competent assistance," as determined by "prevailing professional norms." *Id.* at 690. In reviewing the adequacy of counsel's performance, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. Where, as here, the adequacy of counsel's pre-trial investigation is at issue, the *Strickland* Court stated:

> [S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for

reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Id.* at 690-91.   "[T]he *defendant* must overcome the presumption that, under the circumstances, [a] challenged action [or omission] might be considered sound trial strategy."  *Id.* at 690 (internal quotation marks omitted) (emphasis added).

Meanwhile, to establish prejudice, a defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id.* at 694.  A reasonable probability "is a probability sufficient to undermine confidence in the outcome."  *Ibid.*  "When determining prejudice, [a court] must consider the errors of counsel in total, against the totality of the evidence in the case."  *Stewart v. Wolfenbarger*, 468 F.3d 338, 361 (6th Cir. 2006).

## 2. *Munoz's Assertions of Ineffectiveness*

Munoz argues that Bergmann's assistance was ineffective in that he failed (1) to investigate potential character witnesses adequately, (2) to move for a change of venue or a continuance, (3) to cross-examine Tagaban adequately, and (4) to impeach Tagaban's testimony using the pre-sentence reports from his prior convictions and a prior inconsistent statement.  None of these claims has merit.

## a.  Inadequate Investigation of Character Witnesses

As the district court described the trial, the "principal, if not only, issue" to be decided by the jury was "the credibility of Mr. Munoz, presumably versus that of Mr. Tagaban . . . ."  Thus, the district court reasoned,

> it [was] imperative that Mr. Munoz's defense counsel devote intense efforts to preparing for a credibility contest between Mr. Munoz and Mr. Tagaban. Such efforts may reasonably have included interviewing individuals who might have been able to serve as character witnesses and to testify as to the respective reputations for veracity of Mr. Munoz and Mr. Tagaban. *See United States v. Polsinelli*, 649 F.2d 793, 798 (10th Cir. 1981) (when the key issue is the jury's credibility determination between the main government witness and the defendant, "character witnesses . . . assume[ ] a position of greater importance than would be true in the ordinary case.").

*Munoz*, 2009 WL 529859, at \*7.

The evidentiary hearing established that Munoz's sister had informed Bergmann "that a number of family members and other individuals within [Munoz's] community in Southern California would have been willing to serve as character witnesses for Mr. Munoz at trial." *Ibid.*  Because "[t]he record [was] devoid of evidence showing that [Bergmann] interviewed these witnesses or conducted other investigation as to the possible value of their trial testimony," the district court concluded that Bergmann's performance was objectively unreasonable. *Ibid.*

This was error.  The district court failed to note that Bergmann *did* locate and call a character witness, and an ideal one, at that – Fregoso, a law-enforcement officer who had been Munoz's neighbor for over 20 years.  Indeed, the district court's opinion does not mention Fregoso's testimony.  Moreover, because neither Bergmann nor Munoz testified at the evidentiary hearing, the record was equally "devoid of evidence" showing that Bergmann *did not* conduct extensive investigation into other potential character witnesses, unbeknownst to Munoz's sister.  Other than the fact that Bergmann successfully located Fregoso, the only conclusive fact in the record about Bergmann's pretrial investigation is the stipulation that Bergmann did not hire a professional investigator, which is not, in itself, particularly conclusive.  *See Bower v. Quarterman*, 497 F.3d 459, 470 (5th Cir. 2007) ("Although [counsel] did not hire an independent investigator, this fact alone is not indicative of ineffective assistance[, even] in a capital case.").

The district court also found that Bergmann's purported failure to investigate character witnesses prejudiced Munoz's defense.  It reasoned that "any extrinsic evidence regarding the relative credibility of Messrs. Tagaban and Munoz would have been particularly compelling to the trier of fact," since this case "c[ame] down to a one-on one situation, i.e., the word of the defendant against the word of the key prosecution witness . . . ." *Munoz*, 2009 WL 529859, at \*9 (quoting *Velarde v. Shulsen*, 757 F.2d 1093, 1095 (10th Cir. 1985)).  The district court therefore concluded that if Munoz had introduced character witnesses – or, more properly, if Munoz had introduced *additional*

character witnesses – there was at least a reasonable probability that he would have "been able to tip the balance of [the] contest of credibility in favor of [his] side . . . ." *Ibid.*

We do not agree that there is a reasonable probability that the testimony of additional character witnesses would have affected the verdict.[13] First of all, the district court was incorrect in framing the case as a one-on-one credibility showdown between Tagaban and Munoz. Besides Tagaban's testimony, the government proffered the testimony of both Delaney and Frizzell that Munoz had confessed knowing that the fateful package contained drugs, as well as George's testimony that he had repeatedly paid Tagaban large amounts of cash for drugs "plain as day" in Munoz's presence. The "contest of credibility," therefore, was not as evenly matched as the district court's opinion suggests.[14]

Further, additional character testimony would have been largely cumulative of what was elicited at trial. In addition to Fregoso's testimony, Bergmann successfully elicited favorable character testimony from the government's own star witness, Tagaban, who agreed that he had "[a]lways known [Munoz] to be an honest, hard-working man." Furthermore, the *government itself* acknowledged during summation that Munoz was "a very sympathetic individual" and that it "would rather have Richard Munoz testifying against Tagaban at trial" than the other way around. In this context, it is simply implausible that additional generic testimony about Munoz's good reputation for truth in the community would have tipped the scales in the other direction. *See United States v. Colomb*, 419 F.3d 292, 301 (5th Cir. 2005) ("Character witnesses necessarily testify

---

[13]We note that under Local Rule 43.2 of the Eastern District of Tennessee, "[e]xcept by leave of the Court, not more than 3 witnesses [may] be called to impeach or sustain the character of any party or other witness in a case."

[14]The district court acknowledged that Delaney and Frizzell's testimony supported Tagaban's version of events, but then immediately dismissed it. *See Munoz*, 2009 WL 529859, at *9 n.5 ("[T]he Court is of the opinion that the TBI Agents' interpretation of Mr. Munoz's statements in response to their questions could have easily been in error."). If Munoz had moved for a new trial on substantial-weight-of-the-evidence grounds, the district court would indeed have been at liberty to "act as a thirteenth juror" and give Delaney and Frizzell's testimony no weight. *Graham*, 125 F. App'x at 628. However, because Munoz's motion was premised on *legal* error, the district court was not sitting as a "thirteenth juror," and was not free to discount Delaney and Frizzell's testimony altogether based upon the mere possibility that a misunderstanding had occurred. *See supra* n.9.

to a limited range of issues, and such testimony is often cumulative when presented by several witnesses.").[15]

## b. Failure To Move for Change of Venue or Continuance

The district court acknowledged that venue was proper in the Eastern District of Tennessee and that it was "unlikely that a compelling argument for change of venue could have been asserted" until the eve of trial. However, the district court concluded that once Munoz's final co-defendant, George, pleaded guilty, "the fundamental character of the case . . . changed dramatically." *Munoz*, 2009 WL 529859, at *7. Although the court-imposed deadline for pretrial motions had expired by that juncture, the district court concluded that a reasonably effective lawyer would nonetheless have moved for a change of venue to the Southern District of California, where Munoz resided – or at the very least, a continuance – because "it would be difficult to understate the . . . practical and logistical limitations [to Munoz's ability to subpoena trial witnesses] when considering the distance between the Eastern District of Tennessee and the Southern District of California . . . ." *Id.* at *8.

We disagree that Bergmann's failure to move for a change of venue on the eve of trial was necessarily deficient performance. Once again, because Bergmann did not testify, we do not know why he declined to so move. As a long-time member of the local bar,[16] he may well have felt that his familiarity with the trial judge would be a great help to his case or that his own argument style or mannerisms would be received more favorably by a local Tennessee jury. Either would constitute "sound trial strategy." *Strickland*, 466 U.S. at 689.

---

[15]The ineffective-assistance cases cited by Munoz holding that additional *alibi* witnesses would not have been cumulative are not on point. An alibi witness's testimony is based on direct first-hand knowledge that a defendant could not have committed the charged offense, and, if believed, is inherently dispositive of the case, in a way that testimony of good character is not. *See Washington v. Smith*, 219 F.3d 620, 634 (7th Cir. 2000) (stating that the truth of defendant's alibi, where one is raised, is "*the* issue in the case").

[16]*See* Board of Professional Responsibility of the Supreme Court of Tennessee Online Attorney Directory, at http://www.tbpr.org/Consumers/AttorneySearch/ (stating that Bergmann has been licensed to practice law in Tennessee since 1981) (last visited May 12, 2010).

Further, Munoz cannot show prejudice here either.  As already discussed, there is not a reasonable probability that Bergmann's failure to investigate and call additional character witnesses changed the outcome of the trial; a fortiori, there is no reasonable probability that the verdict would have been otherwise if Bergmann had secured a change of venue or a continuance, and thereby been able to put additional character witnesses on the stand.  Nor is it relevant, as Munoz posits, that "the jury pool in Southern California would have included a greater percent of Hispanic people" who would have been less "likely to group the Mexican-Americans [i.e., Munoz and Tagaban] together and . . . find a 'conspiracy' between these superficially similar individuals."  Appellee's Br. at 34-35.  We are not free to presume that the Tennessee jury acted based upon racial prejudice or stereotyping, as courts considering ineffectiveness claims must "proceed on the assumption that the decisionmaker [was] . . . impartially applying the standards that govern[ed] the decision."  *Strickland*, 466 U.S. at 694.

**c.  Failure To Adequately Cross-Examine Tagaban**

Next, Munoz argues that Bergmann was ineffective in failing to adequately cross-examine Tagaban (or, technically speaking, to adequately *re*-cross him) regarding the statement he gave to Delaney and Frizzell upon his arrest.

At the start of Tagaban's direct examination, the government introduced Tagaban's favorable plea agreement and questioned him about it, presumably to "draw the sting" of Bergmann's inevitable attempt to impeach Tagaban on that basis.  Sure enough, Bergmann then cross-examined Tagaban at length regarding the plea agreement, including the fact that Tagaban had two prior felony convictions and would therefore receive a 20-year minimum sentence but for his cooperation with the government.  Bergmann's cross-examination culminated with this exchange, clearly suggesting that Tagaban had a motive to lie:

> Q. All right. If you do all these things, if you testify, if you – you have to provide substantial assistance in the prosecution . . . then you're hoping that the government will recommend a downward departure, right, on your sentencing?

A. Yes sir.

\* \* \*

Q. You . . . hope that you don't have to do 20 years?

A. No, no, sir.

Q. So a lot today depends on your testimony. Is that right?

A. I guess so, sir.

On redirect, the government attempted to rehabilitate Tagaban by pointing to a contemporaneous statement he had given to Delaney and Frizzell *before* he entered into the plea agreement, presumably to show that Tagaban had made prior statements consistent with his trial testimony before he had a motive to lie:

> Q. You were arrested on July 27, correct? . . . What you said to [the officers] that day, before you ever had a plea agreement with the government, was that pretty much what you said here today?
>
> \* \* \*
>
> A. Well, I told them what [Munoz] had done, but I didn't go into any specific detail.
>
> Q. I see. But you did say that Munoz had taken Fed Ex packages for you, didn't you?
>
> A. Yes, sir. Yes, sir.
>
> Q. You said that he'd done it on two occasions, correct?
>
> A. Correct.

Bergmann then performed a brief re-cross, during which he elicited from Tagaban that he had "cooperated from the beginning" – even before the plea agreement was signed – because, *even then*, he hoped for "some consideration on [his] sentence." In other words, Bergmann undercut the government's attempt to rehabilitate Tagaban by prior consistent statement by pointing out that Tagaban already had a motive to lie at the time he made that earlier statement.

Munoz argues that Bergmann was ineffective because he failed to highlight on re-cross that Tagaban's prior "consistent" statement to Delaney and Frizzell – i.e., that

"Munoz had taken the Fed Ex packages for [Tagaban]" – said nothing about whether Munoz *knew* that the packages contained drugs. In other words, the supposed prior "consistent" statement actually *neither* supported *nor* contradicted the most critical part of Tagaban's trial testimony. Accordingly, it did not truly show that Tagaban was telling the same story before he had a motive to lie.

While a shrewd cross-examiner might have pointed this out, Bergmann's failure to do so did not fall below an objective standard of reasonableness. After skillfully impeaching Tagaban, Bergmann *did* undermine the government's attempt to rehabilitate him, albeit on a different basis: the fact that Tagaban's motive to lie preceded the prior "consistent" statement. That Bergmann did not spot, or did not choose to emphasize, *every* basis for undermining the rehabilitation of Tagaban does not render his re-cross constitutionally ineffective.[17]  "[T]he Sixth Amendment guarantees reasonable competence, not perfect litigation." *Baze v. Parker*, 371 F.3d 310, 320 (6th Cir. 2004).[18]

### d. Failure To Investigate Other Impeachment Evidence Against Tagaban

Finally, Munoz argues that Bergmann was ineffective in failing to turn up two sources of impeachment evidence against Tagaban: the pre-sentence reports from his prior convictions (although the convictions themselves were brought out during cross-examination) and the testimony of George McCay as to a prior inconsistent statement by Tagaban.

---

[17]At the time of Tagaban's contemporaneous interview with Delaney and Frizell, Tagaban – assuming his trial testimony was truthful, as the jury evidently concluded – would not have known that Munoz would later assert a lack-of-knowledge defense. Accordingly, Tagaban would have had no reason to *preemptively* raise the issue of Munoz's state of mind at that time. Thus, it is not inherently suspect that Tagaban did not mention Munoz's state of mind during that interview. As a result, the re-cross that Bergman failed to perform would not have impeached Tagaban's credibility; rather, at most, it would have been a second method of undermining the government's attempt to rehabilitate Tagaban by means of his prior "consistent" statement.

[18]The cases Munoz cites for the proposition that "[t]he failure to adequately cross-examine a key witness against the defendant constitutes [ineffective assistance]" are clearly distinguishable, Appellee's Br. at 28, in that they involve the failure to cross-examine altogether, or the failure to bring up glaringly obvious grounds for impeachment. *See, e.g.*, *Higgins v. Renico*, 470 F.3d 624, 632 (6th Cir. 2006) (finding ineffective assistance where counsel entirely "fail[ed] to confront and cross-examine . . . the sole eyewitness"); *Reynoso v. Giurbino*, 462 F.3d 1099, 1114 (9th Cir. 2006) (finding ineffective assistance where counsel did not cross-examine the two eyewitnesses about the fact that they stood to receive a $25,000 reward if defendant was convicted).

Munoz argues that the pre-sentence reports from Tagaban's prior convictions "reveal that Tagaban has a pattern of shifting blame onto others." One report, in a domestic violence case, states that Tagaban had claimed that his wife had attacked him first. Another report, in a drug case, states that Tagaban had claimed that the drugs found on his person belonged to someone else. Had Bergmann located these reports, Munoz argues, he would have been able to demonstrate Tagaban's "modus operandi of . . . always shift[ing] blame," and would thereby have been able to undermine Tagaban's credibility. We disagree. First, once again, because Bergmann did not testify, we do not actually know that Bergmann failed to locate the reports, rather than simply deciding, after locating and examining them, that they would not be of use. This would have been a reasonable professional judgment, as the two facially unrelated incidents described in the reports do not demonstrate a particularly compelling "modus operandi," and would thus have been of only marginal utility in impeaching Tagaban's truthfulness. For that same reason – and because the reports have no bearing on the credibility of Delaney, Frizzell, and George – even if Bergmann did not locate the reports, his failure to introduce them at trial did not prejudice Munoz.

Additionally, Munoz points to the triple-hearsay affidavit of a San Diego investigator averring that he had spoken to a man named George McCay, who is currently incarcerated for marijuana importation and who claims to have met both Tagaban and Munoz in a California jail. According to the investigator's affidavit, "Mr. McCay . . . recalls Mr. Tagaban telling him that Mr. Munoz was innocent." However, yet again, because neither Bergmann nor Munoz testified at the hearing, there is no basis in the record to conclude that Bergmann actually failed to locate McCay. It is equally plausible that Bergmann knew of McCay but felt that placing an incarcerated *drug importer* on the stand to testify on Munoz's behalf in a *drug trial* would associate Munoz with drugs in the minds of the jury, and that this would hurt Munoz more than McCay's testimony would help him. This would not be an unreasonable judgment, because McCay's hearsay testimony could have been used only for the limited purpose of impeaching Tagaban by prior inconsistent statement, not for the truth of the matter asserted – i.e., that Munoz was actually "was innocent." *See* Fed. R. Evid. 613, 802. For

this same reason – and because McCay's testimony could not have been used to impeach the credibility of Delaney, Frizzell, or George – even if Bergmann did not locate McCay, this did not prejudice Munoz.

**3.** *Ultimate* **Strickland** *Determination*

We conclude that Bergmann's representation more than satisfied the minimum constitutional standard set forth in *Strickland*. In holding otherwise, the district court committed legal error and thereby abused its discretion.

## IV. CONCLUSION

For the foregoing reasons, the district court's grant of a new trial is **REVERSED**.