UNITED STATES of America, Plaintiff,

v.

Jordie L. CALLAHAN, et al., Defendants.

CASE NO. 1:13CR00339

United States District Court, N.D. Ohio, Eastern Division.

Signed July 21, 2014

Chelsea S. Rice, Bridget M. Brennan, Office of the U.S. Attorney, Thomas E. Getz, AUSA, Former Assistant U.S. Attorney, Cleveland, OH, for Plaintiff.

Donald Butler, Carolyn M. Kucharski, Edward G. Bryan, Office of the Federal Public Defender, Cleveland, OH, Vanessa F. Malone, Office of the Federal Public Defender, Akron, OH, Jennifer Yobe Scott, Lakewood, OH, for Defendants.

### *MEMORANDUM OF OPINION AND ORDER* [Resolving ECF Nos. 167, 168]

PEARSON, JUDGE.

Defendants Jordie Callahan and Jessica Hunt (hereafter "Defendants") jointly submit to the Court a motion for judgment of acquittal and a motion for new trial. The Government filed a brief in opposition, to which Defendants filed a reply. The Court has reviewed and considered the parties' briefs, the law, and the trial record. For the reasons explained below, the motions are denied.

### I. *Factual and Procedural Background*

Following a twelve day trial, a jury convicted Defendants of conspiracy to commit forced labor and to acquire a controlled substance by deception in violation of 18 U.S.C. § 371 (Count 1 of the Indictment); forced labor in violation of 18 U.S.C.

§§ 1589(a) and 2 (Count 2); and acquiring a controlled substance by deception in violation of 21 U.S.C. § 843(a)(3) (Count 4). In addition, the jury found that each forced labor violation included the offense of kidnapping or attempted kidnapping within the meaning of 18 U.S.C. § 1589(d).[1]

## A. Trial Evidence

The victims of Defendants' crimes were a cognitively impaired woman, S.E. and her young daughter, B.E.[2] The jury heard extensive evidence at trial regarding the nature of the relationship between Defendants and S.E. Initially, they belonged to the same social circle in Ashland, Ohio—a group in which individuals abused illegal drugs and engaged in petty shoplifting. In May, 2010, S.E. was released from jail where she had been incarcerated for several weeks for stealing items from a local Walmart. Having no family members willing to take her in and no place to stay, S.E. turned to Defendants and joined them at 509 West Main Street as a roommate. S.E. and B.E. lived at that address—a house composed of three apartment units—until October 24, 2012. On that date, S.E. was arrested for stealing candy from a convenience store. After her arrest, S.E. revealed to authorities the details of the living conditions that she and B.E. endured while staying at the house.

In describing S.E. and B.E.'s experiences to the jury, the Government painted a grim portrait of captivity, abuse, intimidation, degradation, and exploitation. S.E. testified that Defendants locked her and her daughter in the basement and upstairs bedroom of Apartment 2 and made them live in filthy, subhuman conditions. Because neither the basement nor the upstairs bedroom had a toilet, S.E. dealt with her natural urges by soiling herself or relieving herself on the floor. Defendants released S.E. during the day to do errands and chores, such as cleaning the house, cleaning up after Defendants' pit bulls, cleaning up after Hunt's four boys, working in the yard, or picking up items at local convenience stores. B.E. was forced to remain confined in the basement or upstairs bedroom, however, and S.E. was not permitted to feed her daughter or herself until late in the evening when S.E. had completed all her housework. The Government also presented evidence showing that when S.E. and B.E. stayed in the upstairs bedroom of Apartment 2, Defendants watched them with a camera in the bedroom that fed video images to a baby monitor.

Numerous witnesses provided corroborating testimony of S.E. and B.E.'s confinement. Jamie McPheeters, a maintenance man, testified that he observed human feces on the floor of the basement when he went to perform work on the house. Allen Redmon testified that when he went to the house to service the cable system, he inadvertently turned on a baby monitor beside the television and saw a live video of a woman and a small child lying on the floor of a room. A tenant of Apartment 3, Derek Lawrence, contacted the Ashland Health Department in April, 2012, and

---

[1] Defendants were acquitted on charges of theft of government benefits (Count 3) and tampering with a witness (Count 5). Because Defendants were convicted of conspiracy to commit forced labor and acquire controlled substance by deception as well as substantive charges for each offense, the Court, for expediency, frequently refers to the substantive charges without also explicitly referencing the conspiracy. It should be understood that the Court is referencing both the conspiracy and substantive offenses.

[2] B.E. was between three and five years of age during the time period of the offenses.

conveyed his suspicion that a disabled woman and her child were being locked in the house, and that when Defendants let the woman out they allowed a pit bull to abuse her. Rachel Pryor, the girlfriend of Hunt's brother, testified that she once attempted to go to the upstairs bedroom but was overcome by the smell of urine and human excrement. Daniel Brown, an admitted co-conspirator,[3] testified that, under Callahan's direction, he locked S.E. and B.E. in the upstairs bedroom of Apartment 2 at night, and bolted a window at a staircase landing near the bedroom, to prevent S.E. from escaping.

In addition, numerous witnesses whom encountered S.E. at 509 West Main Street, on one of her trips to the convenience store, or elsewhere, observed her dirty, sickly appearance, her foul odor, her fearful demeanor, and the marks and bruises clearly visible on her body. One convenience store clerk distinctly remembered S.E. repeatedly coming into the store without shoes or with just one shoe. On October 25, 2012, shortly after five year old B.E. was removed from 509 West Main Street, Police Officer Kim Mager observed that she appeared half her age and seriously underweight. Officer Mager testified that B.E. was in very poor condition: her hair was patchy and thin, she had no muscle tone, her stomach was distended, her rib cage was sunken in, she had dark circles under her eyes, her skin was poor, she was dirty, and an unpleasant odor emanated from her body.

The jury heard eyewitness accounts of the abuse and humiliation that Defendants levied on S.E. and B.E at 509 West Main Street. Brown and another admitted co-conspirator, Dezerah Silsby,[4] both testified that they saw Hunt strike B.E. for soiling herself. According to Brown, Callahan also "whipped" B.E. Silsby saw one of Hunt's four boys, D.H., hit B.E. on the head in front of Hunt and S.E. S.E., likewise, testified that she observed Hunt's boys hit, kick, and throw B.E. Brown witnessed Callahan terrorize B.E. by throwing a snake on her.

The evidence showed that S.E. also suffered substantial abuse. Glenn Stackhouse, a frequent visitor to the house in May, 2012, saw Hunt push S.E.'s face into dog excrement before ordering her to clean it up. Stackhouse also observed Callahan grab S.E.'s neck and scream at her for failing to feed a baby squirrel that Defendants were caring for. On another occasion, according to S.E., Callahan ordered her to wear a dog collar, go into a dog cage, and eat dog food while Hunt and her boys watched.

S.E. testified about incidents in which: (1) Hunt struck her in the face and head when she purchased items from the store that were not on the list provided by Defendants; (2) Hunt beat S.E. with a wooden plank after S.E. took food intended for Hunt's boys; (3) Silsby, in Defendants' presence, slammed S.E.'s hand in a door and with a large rock so Defendants could acquire the pain pills prescribed for S.E.'s injuries; (4) Callahan kicked S.E.'s hip with steel toe boots for the purpose of obtaining prescription pain pills; (5) Hunt's son, D.H., shot S.E. in the arm and leg with a B.B. gun after S.E. soiled herself; (6) Hunt ordered S.E. to wipe her face in her own excrement when S.E. defecated in her pants; (7) Brown, in Defen-

---

3. Brown entered into a plea agreement in which he pleaded guilty to one count of conspiracy to commit forced labor and acquiring controlled substance by deception.

4. Silsby entered into a plea agreement in which she pleaded guilty to one charge of conspiracy and one charge of acquiring a controlled substance by deception.

dants' presence, shaved S.E.'s hair into a mohawk and wrote "[w]hore, tramp, slut, bitch" on her head and chest; and (8) upon Defendants' discovery of S.E.'s written plans to escape, Callahan kicked S.E. in the face, Hunt threw soda at her, and Brown slammed her face into the kitchen sink. S.E.'s testimony was corroborated, in part, by the testimonies of Silsby—whom admitted slamming S.E.'s hand with a rock after Defendants had a discussion about acquiring prescription pain mediation; Brown—whom admitted shaving S.E.'s hair into a mohawk and writing obscenities on her face when Hunt discovered S.E.'s escape plans; Justin Young, Hunt's brother—to whom Defendants admitted that Callahan kicked S.E. in an attempt to obtain the pain medication that would be prescribed to S.E.; and Pryor—whom witnessed Defendants punch S.E. after she used a shirt belonging to one of Hunt's boys to clean the house.

The jury reviewed evidence that Defendants controlled S.E. not just through the infliction of physical and psychological torment, but by creating a climate of fear and intimidation. McPheeters witnessed Callahan loudly yelling at S.E. and threatening to beat her up. S.E. testified that Defendants threatened to beat her up if she exceeded her time limit for going to the store; that Callahan thrust a knife at S.E.'s hand when she took too long at the store and when he suspected her of talking to anyone there; and that Callahan had pointed one of his guns at S.E. and B.E. for, again, taking too long to purchase items for Defendants. According to the testimonies of S.E., Silsby, and Brown, both Defendants threatened to hurt B.E. if S.E. did not punish her child by hitting her.

The Government introduced three videos taken with Callahan's cell phone that showed S.E. hitting B.E. S.E. and Brown each testified that Defendants ordered S.E. to hit B.E., then recorded the abuse on video. Brown admitted that he and Defendants, using their cell phones, video recorded S.E. striking B.E. with a belt in the bathroom after Callahan ordered S.E. to commit the act. On that occasion, Brown testified, he and Defendants directly recorded the incident with their phones. Brown testified that, on other occasions, Callahan used his cell phone to record images of S.E. hitting B.E. from the baby monitor screen. Then, too, S.E. had hit B.E. on Defendants' orders. According to both Brown and S.E., Defendants threatened to show the videos of S.E. abusing B.E. to the authorities if S.E. ever "messed up" or "snitched." Indeed, shortly after S.E. reported to the police that she was afraid of Defendants, Callahan provided two such videos to Police Officer Jerry Bloodhart. Officer Bloodhart had gone to 509 West Main Street to notify Callahan that S.E. and B.E. "didn't need to be back" at that house.

The Government tied the proof of Defendants' conduct to the evidence showing that Defendants exploited S.E.'s labor and access to prescription drugs. S.E.'s testimony that Defendants forced her to do housework and other errands was corroborated by the testimonies of numerous eyewitnesses. When Derek Lawrence communicated his concerns about S.E. and B.E. to the Ashland Health Department, he also reported that S.E. "was always doing stuff" and "always on the run, like going places for [Defendants]." Stackhouse saw Hunt push S.E.'s face into dog waste and order S.E. to clean it up. When Stackhouse asked Callahan about what he saw, Callahan responded that it was S.E.'s job to clean everything up. Stackhouse also testified that he saw S.E. doing dishes, sweeping, mopping, cleaning the yard, and going to the store to get cigarettes for Defendants "[a]t least every

day." On one occasion, Stackhouse saw S.E. walking on the street with a large bag of dog food. When Stackhouse stopped to talk to S.E., S.E. "didn't want to talk" and appeared to be "in a hurry." According to Stackhouse and other witnesses, Defendants never said "thank you" or "please" to S.E. Silsby disclosed that, on most occasions when she was, at 509 West Main Street, she observed S.E. cleaning up after Defendants' dogs, sweeping the floors, doing the dishes, and wiping the walls. Silsby witnessed Hunt order S.E. to do housework and yell at S.E. if the work was not done. In the summer of 2011, Police Officer Craig Kiley stopped S.E. on the street and learned that she was on her way home after purchasing two "Polar Pops" from a local store for Defendants.

Defendants' friend and pill supplier, Debra Brooks, testified about an incident in which she saw S.E. scraping paint from the side of the house on 509 West Main Street. When she asked Hunt why S.E. was scraping paint, Hunt responded, "[S.E.] would do it if she knows what's good for her." Brooks also witnessed (1) Hunt order S.E. to go to the store to get cigarettes and pop; (2) S.E. traveling from the store on "numerous occasions"; and (3) S.E. doing dishes in the house. Brown testified that "seventy five percent of the time" he saw S.E. at 509 West Main Street, she was doing housework or errands, which included cleaning the house, washing dishes, cleaning up after Defendants' dogs, taking the dogs out, cleaning the snake cage, and getting pop and cigarettes for Defendants from the store. On one occasion, Brown witnessed Hunt "smack[ ]" S.E. for purchasing a candy bar for herself. Another witness, Rachel Pryor, saw S.E. clean up after Hunt's children and go to the store on "numerous occasions" to purchase cigarettes and beer for Defendants. Pryor testified, that once, when S.E. was taking longer than usual at the convenience store, Hunt became angry and stated that she was going to make sure S.E. "wasn't talking to anybody she wasn't supposed to." Pryor testified that she "often" heard Defendants threaten S.E. with the prospect of having B.E. taken away from her.

Evidence showed that Defendants successfully carried out their plan to obtain prescription pills by hurting S.E.'s hand. According to S.E., Defendants instructed S.E. to go to the hospital and provide a false explanation for how she sustained the injuries to her hand. S.E. received one Vicodin pill at the hospital and a prescription for more pills. S.E. "cheeked" the one pill and, when she returned home, S.E. gave the pill to Defendants, who crushed and snorted it. S.E. testified that Hunt later filled S.E.'s prescription at CVS, and that Defendants sold the pills. S.E.'s account of the events was supported by CVS pharmacy records, which revealed that Hunt picked up S.E.'s prescription for Vicodin. Furthermore, Silsby, who accompanied S.E. to the hospital, testified that S.E. had "cheeked" or faked ingesting the pill that was given to her at the hospital. Silsby also testified that while she and S.E. were at the hospital, Silsby received text messages from Hunt inquiring whether S.E.'s hand was broken and whether she would be given medication for her injuries. Defendants did not give any of the pills they obtained from S.E.'s prescription to S.E.

The Government offered proof of the unique vulnerabilities attendant to S.E. as a cognitively impaired, socially isolated, single mother. S.E.'s father, Robert Holderbaum, testified that S.E. had always been "slow" and had comprehension problems. When S.E. was sixteen years old, she sustained a traumatic brain injury after being involved in a serious car accident. Holderbaum stated that, after the

accident, S.E. was even slower and exhibited marked speech difficulties. Nearly all of the witnesses whom had encountered S.E. testified that she was noticeably slow. The Ohio Disability Determination Service coded her disability as "mental retardation."

The jury learned that S.E. and B.E. subsisted at or near the margins of society. S.E.'s mother kicked S.E. out of her house when S.E. was eighteen, and repeatedly told S.E. that there was no room for her at the house. S.E. did not meet her biological father until she was fifteen and did not maintain a relationship with him. Because no family members were willing to live with her, S.E. found herself intermittently homeless and frequently changing residences. To provide for her and her daughter's survival, S.E. relied on various government programs to learn how to care for B.E. and depended on social security benefits as her only source of income.

Finally, the jury considered the proof describing the additional steps Defendants took to conceal S.E. and B.E. from the authorities. Mindy Trevino, a social worker assigned to Defendants, stated that she paid numerous visits to 509 West Main Street but was typically denied access into the home. She characterized the denial of access as "very unusual." The Government played recordings of threatening voice messages left by Callahan instructing Brown to keep S.E. away from the windows of the house and calling S.E. a "snitch." In August, 2012, Officer Mager went to 509 West Main Street to investigate an allegation by S.E.'s mother that S.E. and B.E. were being held against their will. Officer Mager testified that Defendants refused to allow her into the house. Defendants also told the officer that S.E. had left to stay with a family member in Mansfield, Ohio, and they had not seen S.E. in "a while." Later that day,

Defendants called the police to report that S.E. had returned. When Officer Mager returned to 509 West Main Street, S.E., in the presence of Defendants, confirmed that she had been in Mansfield. S.E. testified at trial that she has never lived in Mansfield and had lied to Officer Mager at the behest of Defendants.

**B. Pending Motions**

Defendants have filed motions for judgment of acquittal and for new trial. The motions challenge the sufficiency and weight of the evidence presented by the Government, the legal instructions and verdict forms given to the jury, and the Court's rulings denying a mental examination of S.E. and limiting the cross examination of Brown. The Government filed responses to both motions. Defendants replied. The motions are ripe for adjudication.

## II. *Legal Standard*

### A. Motion for Judgment of Acquittal

◼ Rule 29(a) of the Federal Rules of Criminal Procedure provides in relevant part that the district court, on the defendant's motion, "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." The United States Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), established the standard for challenges based on the claimed insufficiency of the evidence, holding: "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319, 99 S.Ct. 2781 (emphasis in original); *see United States v. Smith*, 749 F.3d 465, 476 (6th Cir.2014); *United States v. Fisher*, 648 F.3d 442, 450 (6th Cir.2011); *United States v. Warshak*, 631 F.3d 266, 308 (6th Cir.

2010) (en banc). This is a "very heavy burden" for defendants who have been convicted to meet. *United States v. Jones,* 641 F.3d 706, 710 (6th Cir.2011).

Under this standard of review, the district court " 'do[es] not weigh the evidence, assess the credibility of the witnesses, or substitute [its] judgment for that of the jury.' " *United States v. Paige,* 470 F.3d 603, 608 (6th Cir.2006) (*quoting United States v. Wright,* 16 F.3d 1429, 1440 (6th Cir.1994)). Rather, the court must "draw all available inferences and resolve all issues of credibility in favor of the jury's verdict." *United States v. Salgado,* 250 F.3d 438, 446 (6th Cir.2001); *see United States v. Overmyer,* 867 F.2d 937, 939 (6th Cir.1989) ("the court assumes the truth of the evidence offered by the prosecution" [internal quotations omitted] ). "Reversal of a conviction is warranted only if, viewing the record as a whole, the judgment is not supported by substantial and competent evidence." *Smith,* 749 F.3d at 477 (internal quotations omitted). "Substantial and competent circumstantial evidence by itself may support a verdict and need not remove every reasonable hypothesis except that of guilt." *United States v. Lee,* 359 F.3d 412, 418 (6th Cir.2004).

**B. Motion for New Trial**

Rule 33(a) of the Federal Rules of Criminal Procedure provides in relevant part: "Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." "The paradigmatic use of a Rule 33 motion is to seek a new trial on the ground that the [jury's] verdict was against the manifest weight of the evidence." *United States v. Munoz,* 605 F.3d 359, 373 (6th Cir.2010) (internal quotations omitted). Unlike when the district court is called to decide a motion for judgment of acquittal, the district court, when considering the weight of the evidence for purposes of adjudicating a motion for new trial, "may act as a thirteenth juror, assessing the credibility of witnesses and the weight of the evidence." *United States v. Hughes,* 505 F.3d 578, 593 (6th Cir.2007).

"Motions for a new trial are not favored and are granted only with great caution." *United States v. Garner,* 529 F.2d 962, 969 (6th Cir.1976). Such motions "are granted only in the extraordinary circumstance where the evidence preponderates heavily against the verdict." *Hughes,* 505 F.3d at 593. A convicted defendant "bears the burden of proving that a new trial should be granted." *United States v. Davis,* 15 F.3d 526, 531 (6th Cir.1994).

Finally, Rule 33's "interest of justice" standard also "allows the grant of a new trial where substantial legal error has occurred." *Munoz,* 605 F.3d at 373; *see United States v. Wall,* 389 F.3d 457, 474 (5th Cir.2004) ("any error of sufficient magnitude to require reversal on appeal is an adequate ground for granting a new trial"); *United States v. Kuzniar,* 881 F.2d 466, 470 (7th Cir.1989) (new trial may be warranted when "the substantial rights of the defendant have been jeopardized by errors or omissions during trial"). The decision of whether a new trial should be granted rests within the district court's sound discretion. *United States v. Wheaton,* 426 F.Supp.2d 666, 669 (N.D.Ohio 2006) (*citing United States v. Hoffa,* 382 F.2d 856, 862 (6th Cir.1967)).

**III. *Discussion***

**A. Forced Labor**

Defendants contend that the evidence presented at trial with respect to the elements of the forced labor statute was insufficient for a conviction or weighed heavily against the verdict. Defendants

maintain that S.E. did not render "labor" or "services" while living at 509 West Main Street; rather, she was a roommate who voluntarily helped out with daily household chores that did not involve intense effort. In Defendants' view, there was no evidence to show that Defendants committed any act with the intent to coerce the performance of labor or services from S.E.[5]

The forced labor statute punishes those who:

> knowingly provides or obtains the labor or services of a person by any one of, or by any combination of, the following means—(1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person; (2) by means of serious harm or threats of serious harm to that person or another person; (3) by means of the abuse or threatened abuse of law or legal process; or (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint. . . .

18 U.S.C. § 1589(a).

 "The term 'labor or services,' which is not defined by the statute, is viewed in accord with its ordinary meaning." *United States v. Marcus*, 628 F.3d 36, 44 (2d Cir.2010). Webster's Third New International Dictionary (1993) defines "labor" as "expenditure of physical or mental effort esp. when fatiguing, difficult, or compulsory," and "service" as "the performance of work commanded or paid for by another." There is no question that the work performed by S.E. fits within the meaning of "labor or services" when viewed in the context of the Government's

theory. The salient question for the Court to determine is whether the evidence before the jury demonstrated that Defendants knowingly obtained the work from S.E. in a manner prohibited by the statute.

### 1. *Failure to Seek Help*

Defendants argue that the evidence did not show that S.E. and B.E. were physically restrained or subjugated by Defendants. Defendants point to numerous occasions when S.E. had an opportunity to seek help from others, but did not. In particular: (1) S.E. was arrested in March, 2011, after she, Silsby, and Hunt attempted to shoplift items from Walmart; (2) Silsby testified that she regularly transported B.E. to be with B.E.'s father, James Neff; (3) S.E. was questioned by police officers in January, 2012, after she was shot by Hunt's son with a B.B. gun; (4) in early 2012, S.E. attended court-ordered counseling for a shoplifting incident and told counselors that Hunt was her friend; and (5) in April, 2012, S.E. denied to a psychologist during a mental status exam administered by the Bureau of Disability Determination that she was a victim of abuse.

 S.E.'s failure to seek help does not establish that she and her daughter were free from Defendants' control. The jury reviewed evidence that S.E. was a battered and degraded woman. Both she and her daughter were frequently beaten and abused by Defendants. The Government proffered evidence showing that S.E. was punched, kicked, hit with objects, screamed at, grabbed, cruelly intimidated, and threatened with weapons when she did not follow Callahan or Hunt's express instructions. B.E. remained confined at 509 West Main Street, under Defendants'

---

**5.** Defendants also argue that the "focus" of the forced labor statute is to combat the international trafficking of human beings. No-

where in the text of the statute is there language requiring proof of international human trafficking in order for the statute to apply.

watch, when S.E. was out. Defendants also threatened to show videos of S.E. hitting B.E. if she "messed up" or "snitched." The specter that S.E. or B.E. would be subject to further physical or psychological harm, or that Defendants would cause B.E. to be taken away from S.E., if S.E. did anything to cast suspicion on Defendants, provided the jury with a plausible explanation for why S.E. did not seek help in the situations identified by Defendants.

### 2. *Basement*

#### i.

Defendants maintain that the evidence did not prove that S.E. and B.E. were held against their will in the basement of Apartment 2. According to Defendants, S.E. and B.E. voluntarily stayed in the basement as a favor to Hunt. Defendants point out that (1) the Ashland County Department of Jobs and Family Services permitted Hunt's children to stay with her at 509 West Main Street on the condition that S.E. and B.E. did not also live there, and (2) the caseworker inspected Hunt's family approximately once a month. S.E., Defendants claim, stayed in the basement to help Hunt keep her children and "would only have to do this on average once a month."

 In contrast, S.E. provided vivid testimony about her and B.E.'s confinement in the basement. Her testimony underscored that the confinement was neither voluntary nor infrequent. S.E. testified that Callahan locked her and B.E. in the basement and that Callahan released S.E. in the morning to do the work required by Defendants. S.E. testified that her and her daughter's clothing, which S.E. was unable to clean, was kept on the floor of the basement. According to S.E., there was no mattress in the basement, therefore, she and B.E. slept on the concrete floor away from pools of water. S.E. stated that she was denied access to a toilet and was forced to relieve herself on the floor. S.E. recounted that she could only feed herself and her daughter at the end of the day after she had completed all of her chores and errands. In addition, S.E. also recalled how cold it was in the basement, and recounted her efforts to keep B.E. warm by holding the child close to her body.

S.E.'s account of the events was corroborated by other evidence. McPheeters observed human excrement on the floor of the basement when he came to work on the house. Redmon accidentally turned on a baby monitor in the house and witnessed live video of a woman and a child lying on the floor. Numerous witnesses testified about S.E.'s filthy, disheveled, and foul appearance. Officer Mager recalled that B.E. appeared sickly, severely malnourished, and stunted in her growth. A tenant of Apartment 3 reported his suspicion to the health department that a disabled woman and her child were being locked in the home. Furthermore, the Government presented evidence showing that, after an incident in which S.E. escaped from the basement, Defendants relocated S.E. and B.E. to the upstairs bedroom of Apartment 2. There, Brown admitted to locking S.E. and B.E. in the bedroom at night, and bolting shut a nearby window to prevent S.E. from escaping.

Defendants stress that no eyewitnesses beyond the victim herself observed S.E. and B.E. being confined in the basement. Nevertheless, S.E.'s direct testimony and the relevant circumstantial evidence provided compelling proof that S.E. was forcefully restrained and subjugated.

#### ii.

Defendants contend that S.E.'s story about escaping the basement with B.E.

and seeking refuge at her mother's house cannot be believed. Defendants claim that S.E.'s account of her escape was logistically impossible, and the account of her return to 509 West Main Street defied credibility.

S.E. testified that she was able to escape the basement of Apartment 2 by reaching her hand through a hole in the wall dividing the basements of Apartment 2 and Apartment 1, and unlocking the door from the other side. McPheeters corroborated S.E.'s description of the basement; he testified that a wall with a door separated the basements of Apartments 1 and 2, and that Callahan had installed the wall for "security purposes" to keep the basements separated. McPheeters recalled breaking through the wall to access a shutoff valve when he was making repairs to the house.

Defendants identify several issues that they claim undermine S.E.'s and McPheeters's testimonies. First, Defendants argue that the door described by S.E. and McPheeters was not found anywhere in the basement. Second, S.E. could not have reached her hand through the hole McPheeters made because, in Defendants' view, a hole created to access plumbing valves would not have been made near the door's handle. Third, McPheeters testified that the door was secured with a padlock—S.E. did not mention a padlock when describing her escape.

The issues outlined by Defendants do not repudiate S.E.'s account of her escape. McPheeters made it clear in his testimony that the dividing wall featured a door. Moreover, no evidence was introduced to show exactly where McPheeters created the hole in the wall, and no evidence eliminated the possibility that there was another hole that S.E. could have used to unlocked the door. Though McPheeters testified that the door was secured with a padlock, that does not establish that the

padlock was there at the time of S.E.'s escape, nor does it eliminate the possibility that the door could have been secured by another lock—namely, the one that S.E. manipulated.

Defendants also attack S.E.'s story by pointing out that she voluntarily returned to 509 West Main Street with B.E. the day following her escape. The jury heard testimony that Defendants deployed Silsby and Brown to retrieve S.E. by inducing her with free ice cream from Dairy Queen. They succeeded; S.E. testified that she went to Dairy Queen with Brown to get free ice cream for B.E. Thereafter, Silsby and Brown drove S.E. back to 509 West Main Street. When asked by the prosecutor why she agreed to go back to that address, S.E. responded, "I don't know why; I really don't." Both Silsby and Brown testified, however, that it was apparent S.E. did not want to go back. Once at 509 West Main Street, Defendants told S.E. that her mother would call child services if S.E. stayed with her. According to S.E., she was confused and did not know what to believe. Silsby and Brown then took S.E. to retrieve B.E., and they all returned to 509 West Main Street.

S.E.'s return to 509 West Main Street—and her failure to convey to her mother about her treatment by Defendants—raises questions about her testimony with respect to her living conditions and her escape from the basement. Even so, given S.E.'s special vulnerabilities, lack of close family relationships, and the extensive evidence of abuse, captivity, and coercion, neither an acquittal nor a new trial is warranted. The jury heard evidence that Defendants induced S.E. to leave her mother's house with the promise of free ice cream and employed two confederates to bring her back. Thereafter, Defendants instilled in her the fear that B.E. would be taken away if S.E. did not come back to

live with Defendants. While ordinary, reasonable people may not have behaved as S.E. did, the jury considered the evidence that S.E. was not an ordinary person. Furthermore, the Government offered evidence that when S.E. and B.E. returned to 509 West Main Street, Defendants moved them from the basement to the upstairs bedroom of Apartment 2. Brown admitted that, under Callahan's direction, he locked S.E. and B.E. in that room in the evenings and bolted a nearby window to prevent S.E. from escaping. Accordingly, the proof was neither insufficient to convict Defendants of forced labor nor did it preponderate heavily against the verdict of conviction.

### 3. *Window Near Upstairs Bedroom*

Defendants claim that Brown concocted a story about helping Defendants secure the window at the staircase landing near the upstairs bedroom. In their view, Brown did so to curry favor with law enforcement. To support this claim, they highlight an apparent inconsistency between Brown's testimony and McPheeters's testimony regarding the manner in which the window was bolted. Brown recalled inserting screws at the bottom of the window. In contrast, McPheeters recalled removing screws from the upper part of the window after Defendants had vacated Apartment 2.

Defendants readily admit, however, that when the Government questioned McPheeters about where he removed the screws, the Government showed him the *wrong* picture. The picture shown to McPheeters depicted three holes. After viewing that picture, McPheeters claimed he removed screws from those particular holes. Nevertheless, Defendants concede that the picture shown to McPheeters, Government's Exhibit 43e, was *not* of the window at the staircase landing. While the mistaken exhibit suggests that

McPheeters was incorrect about where the screws were located on that window, it does not impugn Brown's testimony about bolting the bottom part of the window. Notably, McPheeters recalled removing a screw from the bottom portion of that window, as well.

### 4. *Video Recordings of Abuse*

First, Defendants challenge the veracity of Brown's testimony that he and Defendants recorded S.E. beating B.E. with a belt in the bathroom—Defendants point out that such a video was never recovered by the police. Second, Defendants point out that the earliest of the videos extracted from Callahan's cell phone was taken on October 16, 2011. Therefore, Defendants argue, S.E. could not have been coerced into submission by Defendants prior to that date. Third, Defendants contend that the few videos made by Callahan undercuts the notion that the videos were used by Defendants to blackmail S.E. Fourth, Defendants contend that one of the videos extracted from Callahan's cell phone "depicted much of" Brown's account of an incident in which S.E. struck B.E. voluntarily. Finally, that particular video was shot from a low angle, that is, in such a way that it "appears that the video camera [was] hidden in the room." Defendants claim that if the video had been recorded for the purpose of coercing S.E., "there would be no reason for the surreptitious recording."

 None of the above demonstrates that the evidence was insufficient for a conviction, or that the verdict was against the weight of the evidence. That a video was not recovered of S.E. abusing B.E. with a belt in the bathroom fails to establish that the incident did not occur. Similarly, the fact that a video made earlier than October 16, 2011, was not recovered from Callahan's cell phone does not establish that such a video did not exist, or that

Defendants did not use other coercive tactics or threats against S.E. prior to that date to ensure her submission—indeed, the evidence shows that they did. The argument that Callahan would have kept more videos on his phone if he truly wanted to blackmail S.E. lacks persuasive force. After S.E. reported her fears about Defendants to the authorities, Callahan successfully caused the permanent removal of B.E. from S.E.'s custody by showing the videos that he did have to the police.

Defendants claim that an incident captured in one of the videos taken from Callahan's cell phone is very similar to an incident described by Brown in which S.E. voluntarily stuck B.E. Both incidents, claim Defendants, involved S.E. repeatedly spanking B.E. on her rear with her pants down. A jury could conclude, however, the incidents were not the same—that S.E. was forced to spank B.E. in one incident but not in the other. Finally, the "surreptitious" manner in which the video was recorded in no way undermines the jury's verdict. A straightforward explanation is available: Defendants hoped to deflect any suspicion that they played a role in the abuse.

### 5. *Knowledge*

Defendants maintain that the evidence failed to show that any act committed by Defendants was performed with the intention of obtaining labor or services from S.E. Defendants contend that (1) the housework and errands performed by S.E. were done pursuant to her role as a willing roommate in a communal household; (2) there was no proof that Defendants "lured" S.E. to live with them; (3) Brown shaved S.E. head not because she sought to escape the house but because he "lusted" after her and thought she might have been seeing another man; and (4) as even the Government alleged, the smashing of S.E.'s hand was not motivated by the desire to keep S.E. in involuntary servitude but to cause an injury sufficient for Defendants to obtain pain medication.

▮ The Government presented extensive evidence showing that Defendants derived significant personal benefits from S.E.'s presence in the house. On Defendants' orders, S.E. cleaned up the house, cleaned up after Defendants' dogs, picked up after Hunt's boys, did the dishes, performed yard work, and constantly ran errands. The jury reviewed evidence—based on numerous eyewitness accounts—that Defendants punished S.E. severely when she failed to follow Defendants' instructions. Moreover, the Government demonstrated that, simply, Defendants wanted S.E. around and took drastic measures to maintain her subservient relationship to them. The jury reviewed substantial evidence showing that Defendants: locked S.E. in the basement and upstairs bedroom of Apartment 2; asserted psychological control over her by subjecting her to cruel, abusive, and dehumanizing treatment; were highly concerned about the prospect of S.E. talking to other people or taking too long with her errands at the store; threatened S.E. with weapons; threatened to harm B.E.; ordered S.E. to abuse B.E. and then recorded the acts on video for the purpose of blackmailing S.E.; and lied to a police officer about S.E. and B.E.'s whereabouts. Finally, ample evidence permitted the jury to draw the conclusion that S.E. did not willingly assume the role Defendants foisted upon her. S.E. escaped from the basement and made plans to escape from the upstairs bedroom. There can be no doubt, moreover, that nobody would willingly live in the conditions under which S.E. and B.E. lived.

It is true that no evidence suggests that Defendants "lured" S.E. to 509 West Main Street. S.E. testified that in May, 2010, she was looking for a place to stay and had

a chance encounter with Defendants at the Ashland County Department of Job and Family Services. S.E. also testified that, in the beginning, her and B.E.'s living arrangement with Defendants "was good." Yet, notwithstanding the promising start of their relationship as roommates, the evidence demonstrated that S.E.'s relationship with Defendants and her status at 509 West Main Street devolved drastically over time. Defendants also argue that the incidents in which Brown shaved S.E.'s head and Defendants injured S.E.'s hand does not supply proof of an intent to obtain S.E.'s labor. Brown, Defendants claim, acted out of jealousy, and, as alleged by the Government, Defendants injured S.E.'s hand to acquire prescription pain pills. Even if, however, Defendants and their co-conspirators were not *always* motivated by the specific desire to obtain S.E.'s labor or services, when the incidents are viewed in the context of the entire body of evidence, they supply additional, substantial proof of the various ways Defendants tormented and controlled S.E. to acquire various personal benefits—one of which included the receipt of S.E.'s labor or services.

### 6. *Conclusion*

When viewing all the evidence in the light most favorable to the Government—and without making any independent determinations with respect to the credibility of witnesses or the weight of the evidence—the Court concludes that a reasonable jury could have found that Defendants knowingly obtained and conspired to obtain the labor or services of S.E. by a combination of means prohibited by the forced labor statute, including: force, threats of force, physical restraint, serious harm, threats of serious harm, the threatened abuse of law or legal process, and the use of a plan intended to cause S.E. to believe that if she did not perform such labor or services, she or another person would suffer serious harm or physical restraint. Therefore, the Court denies the motion for judgment of acquittal with respect to the convictions for the conspiracy and substantive forced labor offenses.

The Court also concludes that the jury's verdict was not against the manifest weight of the evidence. The evidence overwhelmingly demonstrated that Defendants knowingly coerced S.E., by means prohibited by the forced labor statute, to provide labor or services. The Court found S.E.'s testimony credible. It was corroborated in significant respects by the testimonies of numerous witnesses, including, but not limited to, co-conspirators Brown and Silsby. The palpability of S.E.'s testimony was not lessened by the mode of her questioning on direct examination. In accordance with F.R.E. 611, in order to facilitate the progression of trial and avoid wasting time, to make S.E.'s testimony effective for determining the truth, and to protect S.E. from harassment and undue embarrassment to the extent possible, the Court permitted the Government to ask leading questions during S.E.'s direct examination due to her cognitive impairment. To balance any adverse effects of that control, the Court issued cautionary instructions to the jury in that regard. Moreover, when necessary, S.E. responded that she did not know or understand the question posed.

Accordingly, the Court denies Defendants' motion for new trial with respect to the convictions for the conspiracy and substantive offenses of forced labor.

### B. Acquiring Controlled Substance by Deception

#### 1. *Analysis*

Defendants argue that 21 U.S.C. § 843(a)(3) "has no application to the facts and circumstances presented at trial" because Defendants are not "medical and

pharmaceutical professionals who lied on a DEA form, failed to renew their license, prescribed medication not for any medical purpose, or fudged a patient's medication dosage."

██ 21 U.S.C. § 843(a)(3) provides that "[i]t shall be unlawful for any person knowingly or intentionally" to "acquire or obtain possession of a controlled substance by misrepresentation, fraud, forgery, deception, or subterfuge." "To sustain a conviction under 21 U.S.C. § 843(a)(3), there must be evidence that the defendant acquired ... the drugs in question *by misrepresentation, fraud, ... deception or subterfuge.*" *United States v. Wilbur,* 58 F.3d 1291, 1292 (8th Cir.1995) (emphasis in original; internal quotations omitted). The focus of the statute is on *"how* [the] defendant obtained the drugs." *Id.* (emphasis in original; internal quotations omitted).

██ The Government presented evidence demonstrating that Defendants obtained Vicodin, a controlled substance, for personal use and sale by injuring S.E.'s hand and instructing her to lie to hospital staff about how she received the injury and who would be the recipient of the medication prescribed. S.E. testified that she heard Defendants say that they wanted to obtain pain pills by smashing her right hand so that she would be prescribed pills at the hospital. S.E. recounted that her hand was smashed by Silsby with a door and a rock in Defendants' presence. According to S.E., when she went to the hospital after Silsby injured her hand, she followed Defendants' instructions to provide a false explanation of the injury to the doctor. S.E. testified that Defendants subsequently crushed and snorted the pill that she obtained at the hospital, then sold the pills that Hunt obtained using S.E.'s prescription. S.E.'s testimony was corroborated by CVS pharmacy records showing

that Hunt picked up S.E.'s prescription for Vicodin. Furthermore, Silsby testified that, before she injured S.E.'s hand, Defendants had a discussion about whether they could obtain pain pills for S.E.'s injury. Also, Silsby testified that when she took S.E. to the hospital, she received text messages from Hunt inquiring whether S.E.'s hand was broken and whether she would be given medication for her injuries. Silsby also recalled that S.E. faked ingesting the pill given to her at the hospital—the pill that, according to S.E., Defendants ultimately snorted. Furthermore, Defendants did not give the pills they obtained from S.E.'s prescription to S.E.

Ultimately, the jury was presented with evidence demonstrating that Defendants (1) knowingly or intentionally; (2) acquired or obtained possession of a controlled substance (Vicodin); and (3) that they did so by misrepresentation, fraud, deception, or subterfuge. In regard to the final prong—the Government submitted proof demonstrating that Vicodin would not have been prescribed to S.E. had the hospital staff known the true circumstances of her injury and the fact that S.E. was not going to be the one taking the medication. Viewing all of the evidence in the light most favorable to the Government, a rational jury could find, beyond a reasonable doubt, that the above elements have been proven. Moreover, the evidence does not preponderate heavily against the verdict. S.E.'s credible testimony was corroborated by medical and pharmacy records, and matched Silsby's account of the events in significant respects. Two additional witnesses, Pryor and Young, testified that one or both Defendants had told them about a similar scheme in which Callahan had kicked or punched S.E. in the hip in an attempt to acquire pills prescribed to S.E. Defendants argue that 21 U.S.C. § 843(a)(3) does not apply because their

acts were not "committed by a regulated, licensed person." Defendants do not direct the Court to any part of the statute or other legal authority indicating that it applies *only* to conduct committed by such a person.

### 2. *Conclusion*

Based on the foregoing and relying on the independent standards articulated above and applicable to each motion, the Court denies the motion for judgment of acquittal and the motion for new trial with respect to the convictions for conspiracy and substantive offenses of acquiring a controlled substance by deception.

## C. Legal Errors

### 1. *Jury Instructions: Kidnapping or Attempted Kidnapping*

The jury found that Callahan's and Hunt's violation of the forced labor statute involved the offense of kidnapping or attempted kidnapping. The findings subject Defendants to an enhanced sentence under 18 U.S.C. § 1589(d).[6]

Defendants assert that the Court's instructions to the jury with respect to the kidnapping or attempted kidnapping offense were erroneous in two ways. First, Defendants claim that the Court did not instruct the jury that a finding of the involvement of kidnapping or attempted kidnapping must be beyond a reasonable doubt. Second, Defendants argue that the Court did not instruct the jury that a finding of the involvement of kidnapping or attempted kidnapping, if made, must be made for each defendant separately. Defendants concede that they did not object to the jury instructions at trial and that

therefore the challenged conduct is subject to the plain error standard of review.

 Rule 52(b) of the Federal Rules of Criminal Procedure provides: "A plain error that affects substantial rights may be considered even though it was not brought to the court's attention." As articulated by the Sixth Circuit: "When reviewing a claim under a plain error standard, this Court may only reverse if it is found that (1) there is an error; (2) that is plain; (3) which affected the defendant's substantial rights; and (4) that seriously affected the fairness, integrity or public reputation of the judicial proceedings." *United States v. Barnes,* 278 F.3d 644, 646 (6th Cir.2002).

 "[N]o single provision of the jury charge may be viewed in isolation; rather, the charge must be considered as a whole." *United States v. Ross,* 502 F.3d 521, 527 (6th Cir.2007). "A judgment may be reversed based upon an improper jury instruction only if the instructions, viewed as a whole, were confusing, misleading, or prejudicial." *Id.* (internal quotations omitted).

i.

 The jury's findings that the offense of kidnapping or attempted kidnapping was involved must have been made beyond a reasonable doubt. "Any fact that, by law, increases the penalty for a crime is an 'element' that must be submitted to the jury and found beyond a reasonable doubt." *Alleyne v. United States,* —— U.S. ——, 133 S.Ct. 2151, 2155, 186 L.Ed.2d 314 (2013). The Court instructed the jury with respect to that requirement: "Your second duty is to take the law as I give you, apply it to the facts, and decide if

---

**6.** Section 1589(d) provides: "Whoever violates this section shall be fined under this title, imprisoned not more than 20 years, or both. If death results from a violation of this section, or if the violation includes kidnaping,

an attempt to kidnap, aggravated sexual abuse, or an attempt to kill, the defendant shall be fined under this title, imprisoned for any term of years or life, or both."

the government has proved defendant guilty beyond a reasonable doubt"; "[t]he presumption of innocence stays with the defendant unless the government presents evidence here in court that overcomes the presumption, and convinces you beyond a reasonable doubt that he or she is guilty"; "[y]ou must find a defendant not guilty unless the government convinces you beyond a reasonable doubt that he or she is guilty"; "[t]he government must prove every element of the crimes charged beyond a reasonable doubt." The first quoted instruction was given under the heading, "Juror's Duties." The following three quoted instructions were provided under the heading, "Presumption of Innocence—Burden of Proof—Reasonable Doubt." Although the jury was not specifically instructed that the element of kidnapping or attempted kidnapping had to be found beyond a reasonable doubt, there can be no question that the jury understood this requirement and was amply and adequately instructed. The jurors were instructed orally and in the presence of counsel and Defendants; during deliberations, the Court provided each juror with a copy of the verbatim instructions. Additionally, at the beginning of trial, after voir dire, and prior to the presentation of opening statements and evidence, the Court gave the jury preliminary instructions that made clear that the jury's findings would be based upon that proven beyond a reasonable doubt. Consequently, the Court concludes that there was no plain error that adversely impacted Defendants' substantial rights or the fairness, integrity, or reputation of the proceedings.

ii.

■ Defendants argue that the Court failed to instruct the jury that its finding of kidnapping or attempted kidnapping, if made, must be made for each defendant separately. Defendants set forth the challenged portion of the instructions as follows:

> For Count 2 [forced labor], if you find that the government has proven each of the offense elements beyond a reasonable doubt as to one or both of the defendants, you will next be asked to consider whether the offense as to each defendant included kidnapping. For purposes of this case, 'kidnapping' means to restrain and confine a person by force, intimidation, or deception with the intent to terrorize or cause bodily injury to that person; or to restrain a person's liberty in circumstances that create a substantial risk of bodily harm to that person. If you find that *a defendant engaged in any of the conduct I have just described with respect to S.E. or B.E., you may find the offense—the charged offense included kidnapping.* (Emphasis added.)

It is nonsensical to conclude that the Court instructed or that the jury understood the preceding sentence to mean that, if the jury found that one defendant committed kidnapping or attempted kidnapping, then, on that basis alone, it could find that the other defendant committed kidnapping or attempted kidnapping. That conclusion is fanciful when one considers that the Court also instructed the jury, under the heading, "Separate Consideration—Multiple Defendants Charged with the Same Crimes":

> in our system of justice, guilt or innocence is personal and individual. It is your duty to *separately* consider the evidence against each defendant on each charge, and to return a *separate* verdict for each one of them. For each one, you must decide whether the government has presented proof beyond a reasonable doubt that a *particular defendant is guilty of a particular charge. Your decision on any one defendant or charge,*

*whether it is guilty or not guilty, should not influence your decision on the other defendant or any of the other charges.* (Emphases added.)

The instructions directed the jury to make separate findings for each defendant. There was no error, plain or otherwise, suggesting differently. Contrary to Defendants' assertions, error did not render the instructions confusing or misleading. Nor did error adversely impact Defendants' substantial rights or the fairness, integrity, or reputation of the judicial proceedings.

Accordingly, Defendants' challenges to the jury instructions are unavailing and do not warrant a new trial.

**2. Special Verdict Form for Count 2: Forced Labor**

Defendants point out that for both Callahan and Hunt, the special verdict form for Count 2 failed include an option permitting the jury to find that no kidnapping or attempted kidnapping enhancement applied. The omission, Defendants argue, was akin to a "severe adverse comment by the trial judge" and an "impermissibly grave insinuation of judicial attitude." According to Defendants, because they "contemporaneously" objected to the claimed error, *see* ECF No. 168 at 19, the special verdict forms should be reviewed for abuse of discretion and not plain error.[7]

7. It is not clear what Defendants mean by "contemporaneously" other than that the objection was made by both Defendants at the same time. They did not object, however, until *after* the charge conference, *after* the Court had read the instructions to the jury, *after* the closing arguments, and *after* the jury had begun its deliberations. When the objection was finally raised, the Court engaged in the following colloquy with the attorneys while the jury was sequestered and deliberating with the jury instructions and verdict forms:

THE COURT: Counsel, it's my understanding that you wanted to speak with me about Special Verdict Form Number 2 for Mr. Callahan?

MR. BUTLER: That's correct, Your Honor. Mr. Bryan brought it to my attention, Your Honor, and after looking at it again, it appears that there should be a third option on the form as opposed to the two that's there. I think if the jurors determine that there's no kidnapping or sex abuse, or whatever it says there, then they should have an option saying that it's neither. Because the way it is now, the instruction is like they have to make a choice between one or the other, maybe.

THE COURT: Well, I don't read it that way, but let me hear the rest of you. And primarily, the United States, your position on that?

MS. RICE: Your Honor, we don't have an objection. We don't necessarily believe that it's necessary, but we have no objection of adding it in.

THE COURT: My reading of this, Mr. Butler, is, first of all, if they believe that neither happened, then the strong possibility is they may never get to that form, because they only go to the special verdict form if there's a guilty. And then if there is a guilty, then there's the chance it could say, "Kidnapping and aggravated assault," or only one or the other. Now, I think it's possible to have committed forced labor without kidnapping and without aggravated assault, and that's the concern you have.

MR. BUTLER: Right.

THE COURT: But if they believe that forced labor happened without kidnapping and aggravated assault, they simply won't select one. I don't think they need a blank that says you didn't select one. I think you just don't select one. And I don't think that this would present a confusion for the jury. You can sit there if you want.

MR. BUTLER: No, I understand what you are saying, Judge, and hopefully the jurors are intelligent enough to understand that there's not an option between one or the other, it's either you don't have it or believe it, or you believe it is one or the other.

THE COURT: Because it says "included," which means included, you know, you check one or you don't. The jurors have the verdict forms. I am reluctant to take it back and give them a different one adding "Neither." If I thought there was a real problem there, I would do it. But it doesn't seem to me that you even think there's a

The use of special verdict forms in a criminal case is normally reviewed for an abuse of discretion unless no objection to their use was raised at trial. *United States v. Stonefish,* 402 F.3d 691, 697 (6th Cir.2005). In general, a district court's conduct during a trial is reviewed for abuse of discretion. *United States v. McAllister,* 693 F.3d 572, 584 (6th Cir. 2012). "However, where the defendant does not contemporaneously object to the trial court's conduct ... that conduct [is reviewed] under the plain-error standard." *Id.* (internal quotations omitted).

Special Verdict Form—Count 2 for Callahan reads: "We, the jury, having found Defendant Jordie L. Callahan guilty of Forced Labor, do further find that the offense committed by Defendant Jordie L. Callahan included: (Please check applicable offense(s)) . . . ." The form then lists the following offenses: "Kidnapping/Attempted Kidnapping" and "Aggravated Sexual Abuse." A blank space was provided next to each offense for the jury to mark. The jury placed an "X" next to "Kidnapping/Attempted Kidnapping" and left the space next to "Aggravated Sexual Abuse" blank.

Special Verdict Form—Count 2 for Hunt reads: "We, the jury, having found Defendant Jessica L. Hunt guilty of Forced Labor, do further find that the offense committed by Defendant Jessica L. Hunt included: (Please check applicable offense) . . . ." The form then lists the following offense: "Kidnapping/Attempted Kidnapping." Like the special verdict form for Callahan, the jury placed an "X" in the blank space provided next to "Kidnapping/Attempted Kidnapping."

The Court rejects the contention that the absence of a "No Finding" option, or something similar, for each special verdict form constituted an abuse of discretion and an "impermissibly grave insinuation of judicial attitude." " 'An abuse of discretion will not be found if the jury instructions as a whole ... adequately informed the jury of the relevant considerations and provided a basis in law for aiding the jury in reaching its decision.' " *United States v. Capozzi,* 723 F.3d 720, 725 (6th Cir.2013) (*quoting United States v. Anderson,* 605 F.3d 404, 411 (6th Cir. 2010)). The Court's instructions to the jury underscored that "[t]he government must prove every element of the crimes charged beyond a reasonable doubt" and "[y]ou must find a defendant not guilty unless the government convinces you beyond a reasonable doubt that he or she is

strong possibility of a problem, just a caution.
MR. BRYAN: It was done out of an abundance of caution, Your Honor, just to make sure that there was no ambiguity concerning that matter.
THE COURT: Okay.
MS. RICE: Yes, Your Honor. And if it's an issue, polling the jury should clarify any resulting issues.
THE COURT: Right, absolutely.
MR. BUTLER: You mean after a verdict?
MS. RICE: Well, if it gets to that point, if there's any ambiguity as to whether they believe that it should apply or not.
MR. BUTLER: Well, they—all right. They may or may not have a question as it relates to that.

THE COURT: They could, and then we could certainly clarify it then.
MR. BUTLER: All right.
THE COURT: Okay. So I am not going to modify the verdict—the special verdict form for Count 2 based on the discussion that we've had. If there's a question, I will certainly clarify it. If there is a not guilty on that count, then I think the answer will be clear that they chose neither. If there is a guilty and they check nothing, I don't think that would disappoint you either, because that would simply mean that there aren't those enhancements to be applied.

guilty." Similar admonitions were repeated by the Court throughout the jury instructions and by the parties during the trial. This important requirement could not have been lost on the jury. Moreover, the absence of an option specifying that no enhancement applied did not betray an impermissible judicial attitude. Indeed, the Court instructed the jury under the heading "Court Has No Opinion": "Nothing that I have said or done during this trial was meant to influence your decision in any way. You decide for yourselves if the government has proved defendants guilty beyond a reasonable doubt."

More telling was the jury's choice of one but not the other enhancement for Callahan. The jury chose *not* to mark an "X" in the space next to "Aggravated Sexual Abuse" in the special verdict form for Callahan. On that same form, the jury marked an "X" in the space provided next to "Kidnapping/Attempted Kidnapping."[8] This discernment showed the jury's understanding of and respect for the requirement that they could choose or not choose the options provided. Given the obvious discernment by the jury when completing the special verdict form for Callahan, the jury understood that they were not required to place an "X" next to "Kidnapping/Attempted Kidnapping." on the special verdict form for Hunt.

Therefore, no matter which standard—abuse of discretion or plain error—is applied, Defendants are not entitled to a new trial. The Court did not abuse its discretion or commit plain error by supplying the challenged special verdict forms.

### 3. Decision Limiting Cross Examination of Brown

Defendants assail the Court's decision limiting their cross examination of Brown.

During trial, the Court prohibited Defendants from questioning Brown regarding whether, in exchange for his cooperation with the Government, he was charged only with one count of conspiracy and not an additional substantive count of forced labor. According to Defendants, the Court's ruling violated their right to confrontation under the Sixth Amendment to the United States Constitution.

 "A criminal defendant states a violation of the confrontation clause by showing that he was prohibited from engaging in *appropriate* cross examination designed to show a prototypical form of bias on the part of a witness . . . ." *Delaware v. Van Arsdall,* 475 U.S. 673, 680, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986) (emphasis added). The Confrontation Clause does not "prevent a trial judge from imposing any limits on defense counsel's inquiry into the potential bias of a prosecution witness." *Id.* at 679, 106 S.Ct. 1431. To the contrary, "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Id.*

 The Court did not prevent defense counsel from appropriately cross examining Brown. More specifically, the Court did not foreclose defense counsel's inquiry into the potential bias of Brown during cross examination. The Court permitted Defendants to question Brown about his plea agreement and whether he cooperated to "get a better deal from the

---

**8.** Assuming, *arguendo,* that the forms supplied were tainted by error—and they are not—the error would effect only Defendants' sentencing enhancements and would not provide a basis for a new trial.

government." When, however, defense counsel sought to question Brown about whether the Government decided not to charge him with a substantive count of forced labor in exchange for his cooperation, the Court stopped the inquiry. It is well recognized that "[w]hether to prosecute and what charge to file or bring before a grand jury are decisions that generally rest in the prosecutor's discretion." *United States v. Batchelder,* 442 U.S. 114, 124, 99 S.Ct. 2198, 60 L.Ed.2d 755 (1979). While it was appropriate for defense counsel to question Brown about his plea agreement, it was not proper for defense counsel to attempt to cross examine Brown about a charging decision over which Brown had no control. That line of questioning would have obviously and, perhaps intentionally, elicited irrelevant, prejudicial, and confusing testimony that would not have been based on Brown's personal knowledge.

Accordingly, the manner in which the Court limited the scope of Brown's cross examination on the nature of the charge he faced and pleaded guilty to did not violate the Confrontation Clause.

### 4. Denial of Motion for Psychiatric Examination of S.E.

Defendants finally challenge the Court's denial of Callahan's motion for a psychiatric examination to determine S.E.'s competency. They claim that they were not provided with a diagnosis of S.E.'s mental impairment and were therefore deprived of "critical information" regarding S.E. In particular, Defendants claim that the denial of Callahan's motion was reversible error because (1) Defendants needed to know what S.E.'s impairments were in order to "address those deficits, if any, during cross examination"; and (2) the ruling prevented the jury from appraising S.E.'s credibility and forced the jury to speculate about S.E.'s "special vulnerabilities."

As recognized by Defendants, F.R.E. 601 "allows one not mentally competent to testify, and it assumes that jurors are capable of evaluating a witness's testimony in light of the fact that he [or she] is not mentally competent." *See F.R.E. 601* ("Every person is competent to be a witness unless these rules provide otherwise."). The advisory committee notes to F.R.E. 601 observe that "[d]iscretion is regularly exercised in favor of allowing the testimony" and the question of mental capacity "is one particularly suited to the jury as one of weight and credibility...."

The Sixth Circuit has clarified that a court cannot order a non-party witness to be examined by a psychiatrist; the most that the court may do is to condition a witness's testimony on a prior examination. *United States v. Ramirez,* 871 F.2d 582, 584 (6th Cir.1989). It is generally agreed, however, that "'the power not to allow a witness to testify unless he [or she] submits to a psychiatric examination should be exercised *sparingly*.'" *Id.* at 585 (emphasis added) (*quoting United States v. Gutman,* 725 F.2d 417, 420 (7th Cir.1984)). As explained by the *Ramirez* court, "the sad truth is that an 'expert' can be found to testify on behalf of almost any viewpoint or position. Wisely, we have historically left credibility determinations to the trier of fact...." *Id.*

Here, it was appropriate for the Court to deny the motion for psychiatric evaluation and allow the jury to evaluate S.E.'s credibility, determine the impact of her cognitive impairment, and assess whether S.E. exhibited special vulnerabilities. S.E.'s three day examination gave the jury ample opportunity to consider her mental capacity, memory, temperament, behavior, ability to understand questions, ability to provide truthful and accurate responses, and other relevant characteris-

tics. The jury also heard numerous witness, including S.E.'s father, describe perceptions of S.E.'s mental capabilities and how it affected her day-to-day functioning. S.E. took an oath before testifying and understood that she had to tell the truth. S.E. also confirmed that she would ask for clarification if she did not understand the question posed to her and demonstrated her ability to do so throughout her examination.

Therefore, the jury was not hampered in evaluating S.E. Nor were Defendants denied the means to conduct an effective cross examination. Though a psychiatric evaluation was not permitted, Defendants had ample opportunity to draw out the effects of S.E.'s cognitive impairment for the jury to view, and test, on the stand, her recall, truthfulness, and consistency.

The Court's denial of Callahan's motion does not warrant a new trial.

### IV. *Conclusion*

For the reasons provided, the Court denies, in their entirety, the motion for judgment of acquittal and the motion for new trial.

IT IS SO ORDERED.